IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 96-50764

_____

BETTY TRAVIS,

Plaintiff-Appellee,

versus

THE BOARD OF REGENTS OF THE UNIVERSITY
OF TEXAS SYSTEM; UNIVERSITY OF TEXAS,
at San Antonio,

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Western District of Texas

_____

September 8, 1997

Before POLITZ, Chief Judge, and HIGGINBOTHAM and SMITH, Circuit
Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

Betty Travis prevailed in a jury trial against her employer,
the University of Texas at San Antonio and the Board of Regents of
the University of Texas System.  After reviewing the record, we
conclude that as a matter of law Travis did not prove a violation
of Title VII by a preponderance of the evidence.  Thus, we agree
with the university and the regents that the lower court should
have entered judgment against Travis.

The University of Texas at San Antonio hired Betty Travis on a tenure track as an assistant professor of mathematics in 1980. The university awarded her tenure and promoted her to associate professor in 1985. Her specialty is mathematics education.

During the 1993-1994 academic year, she applied for promotion to full professor. The university puts promotion applications through several tiers of reviews and recommendations. An applicant's file, which includes teaching evaluations, publications, letters of recommendation, evidence of service to the university, and so forth, moves from the applicant's division to the applicant's college to the provost to the president and ultimately to the board of regents. Each stage involves an independent review. The president's decision to promote or not to promote — a decision that the board of regents virtually always adopts — comes in light of the recommendations from the lower levels, but is not dictated by them.

Travis received favorable recommendations from a committee of the Division of Mathematics and Statistics, from the division's director, from a committee of the College of Sciences and Engineering, and from the dean of the college. But the provost, Raymond T. Garza, recommended against promotion. At trial, Garza explained that although Travis's record in teaching and service was excellent, her research was meager and was not published in the better academic journals. He noticed that reviewers on the division and college levels had failed to make detailed comments on

2

her publications and concluded that they had not scrutinized them carefully. Although the dean of the college praised Travis for her teaching skills and her success in landing grants for the university, his report indicated that Travis's research was only "marginally adequate." After investigating Travis's publications, Garza concluded that only one co-authored article had appeared in a "premier" journal and that she had placed only three articles in what he called "category 2" journals. She had also published two chapters in books and three pieces in "regional journals," but in Garza's view those, along with her many conference presentations and invited talks, were of marginal scholarly significance. Garza decided that, compared to other faculty members applying for status as full professor, Travis had not yet made a sufficient contribution to scholarship in her field. The university's president, Samuel Kirkpatrick, concurred in Garza's analysis. Travis received notification in March of 1994 that her application for promotion had been denied.

Travis immediately scheduled a meeting with Provost Garza in early April to discuss the reasons for the denial. Garza explained that in order to earn a promotion, her research would need to be more substantial. He indicated that, in combination with her outstanding teaching and service, she was very close to meeting the university's expectations for a full professor. Several weeks later, Travis told Garza that a journal had expressed interest in one of her papers, and Garza promised to bring that fact to the attention of the president, although he did not know whether it was

too late to reverse the denial. The president informed Travis by letter that if she had additional material to include in her file she would have to submit another promotion application in the 1994-1995 academic year.

On May 11, 1994, Travis filed a charge of discrimination with the Equal Employment Opportunity Commission. She amended her charge on August 5 to add an allegation of unequal pay after learning that Jerry Keating, a male colleague hired in 1981, had been appointed Acting Division Director and earned $12,000 more than she did. On September 24, she filed this lawsuit, which was removed to federal court. The petition alleged causes of action against the university and the board of regents and also against Garza and Kirkpatrick in their individual capacities. Travis alleged that the university had breached a contract and violated the Fair Labor Standards Act and the Texas Equal Rights Amendment by failing to honor a memorandum in which it notified Travis of her salary as Interim Associate Dean. According to the university, a clerical error caused the memorandum to include the salary of Keating, who preceded Travis in the associate deanship, rather than Travis's salary, which was nearly $12,000 less. Travis also alleged that Garza and Kirkpatrick violated the First Amendment by retaliating against her for positions she took in the faculty senate.

As a result of this suit, the university investigated Travis's salary and discovered that a grant from the Office of Naval Research included a salary supplement that seemed to violate OMB

4

guidelines. Richard Dawson, the university's director of internal audit, concluded that OMB Circular A-21 prohibited government grant money from going toward salary supplements above a faculty member's base salary. Although the university had approved the grant that included Travis's supplement, there was no evidence that university officials were aware of any potential violation prior to the audit. Once he learned about the violation, Kirkpatrick was concerned enough to order an audit of all salary supplements at the university. This audit revealed that an untenured faculty member was also receiving a salary supplement that exceeded her base salary. The university terminated both supplements in an effort to comply with federal regulations.

Travis applied again for full-professor status during the 1994-1995 academic year. The only significant change was the acceptance of the article she had mentioned to Provost Garza after the first denial. She also had a new article under submission, three new grants, and talks at two national conferences. She got the same result: the lower levels recommended promotion, but Garza recommended denying the application, and, in spite of Travis's lawsuit, Kirkpatrick followed that recommendation. Garza based his recommendation on the fact that Travis's recently accepted article was to appear in a journal based in India with a circulation of only about 300. Without any significant new research, he was unwilling to reach a different result in 1994-1995 than he had in 1993-1994.

Travis had served as assistant director of her division since 1989. But a few weeks after accepting the post of division director in January of 1995, Don Allen decided that the position of assistant division director was no longer necessary. The university eliminated the position of assistant division director in February of 1995, although it paid Travis her administrative supplement through the end of the academic year.

In an April 10, 1995, amended complaint, Travis sought damages for the removal of her salary supplement and her termination as assistant division director. These actions, Travis alleged, along with the denial of her 1994-1995 application for a promotion, were retaliation for her 1994 EEOC complaint and lawsuit.

The parties agreed to trial before a magistrate judge. After five days of trial, the jury found that the university's denial of Travis's promotion was sexually discriminatory and that the university had retaliated against her for filing a discrimination suit. It also found by special interrogatory that Garza and Kirkpatrick did not violate her First Amendment rights. No other theories of recovery went before the jury. The court ordered the regents to promote Travis as of September 1, 1994, and to pay back- and front-pay for the failure to promote, for the termination as assistant division director, and for the failure to pay supplemental grant salary. It also granted Travis's request in full for $91,088.75 in attorneys' fees. The university and the regents appeal the court's denial of their motion for judgment as

a matter of law on both the sex-discrimination claim and the retaliation claims.[1]

## II.

We review <u>de novo</u> the lower court's ruling on a motion for judgment as a matter of law under Fed. R. Civ. P. 50(a). <u>Omnitech Int'l, Inc. v. Clorox Co.</u>, 11 F.3d 1316, 1322-23 (5th Cir.), <u>cert. denied</u>, 513 U.S. 815, 115 S. Ct. 71, 130 L. Ed. 2d 26 (1994). A court should grant a Rule 50(a) motion not only when the non-movant presents no evidence, but also when there is not a sufficient "conflict in substantial evidence to create a jury question." <u>Foreman v. Babcock & Wilcox Co.</u>, 117 F.3d 800, 804 (5th Cir. 1997) (quoting <u>Boeing Co. v. Shipman</u>, 411 F.2d 365, 375 (5th Cir. 1969) (en banc)).

Travis's sex-discrimination and retaliation theories are subject to the burden-shifting analysis expounded in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), <u>Texas Department of Community Affairs v. Burdine</u>, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981), and <u>St. Mary's Honor Center v. Hicks</u>, 509 U.S. 502, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993). But we need not parse the evidence into discrete segments corresponding to a prima facie case, an articulation of a legitimate, nondiscriminatory reason for the employer's decision, and a showing of pretext. "When a case has been fully tried on the merits, the adequacy of a party's showing at any particular stage

---

[1] The defendants have also appealed evidentiary rulings and the imposition of attorneys' fees. We have no occasion to consider those matters.

of the <u>McDonnell Douglas</u> ritual is unimportant." <u>Molnar v. Ebasco Constructors, Inc.</u>, 986 F.2d 115, 118 (5th Cir. 1993) (citation omitted).

A Title VII plaintiff bears the burden of proving not only that the employer's purported reasons for taking an adverse employment action are pretextual, but also that the employer engaged in illegal discrimination. <u>Hicks</u>, 509 U.S. at 511. In this case, Travis's burden is crucial for two reasons. First, it means that "[to] satisfy the statutory burden, the plaintiff must offer some evidence, whether direct or circumstantial, that permits the jury to infer that the proffered explanation was a pretext for illegal discrimination." <u>Swanson v. General Services Admin.</u>, 110 F.3d 1180, 1185 (5th Cir.), <u>petition for cert. filed</u>, 66 U.S.L.W. 3129 (U.S. July 23, 1997) (No. 97-163). Second, although evidence of pretext, in conjunction with a prima facie case, usually creates a jury question on the ultimate issue of discrimination, it does not always do so. We engage in "traditional sufficiency-of-the-evidence analysis" to determine whether reasonable jurors could find discriminatory treatment. <u>Rhodes v. Guiberson Oil Tools</u>, 75 F.3d 989, 993 (5th Cir. 1996) (en banc). In other words, it is possible for a plaintiff's evidence to permit a tenuous inference of pretext and, by extension, discrimination, and yet for the evidence to be insufficient as a matter of law to support a finding of discrimination. <u>See</u> <u>Walton v. Bisco Industries</u>, ___ F.3d ___, ___, 1997 WL 433984, at *3 (5th Cir. Aug. 19, 1997) ("Separate from her pretext evidence, Walton has offered nothing to suggest that

8

impermissible discrimination underlies her termination."); Ontiveros v. Asarco, Inc., 83 F.3d 732, 734 (5th Cir. 1996) ("There may barely be enough evidence to sustain a finding of pretext. However, there is insufficient evidence to support a reasonable inference of discrimination.").

### III.

We turn first to Travis's claim that the denial of her promotion was caused by sex discrimination. Surprisingly little of the trial involved any reference to Travis's sex. A casual observer would have thought the jury had been asked to decide simply whether the university should have promoted Travis. During their extensive testimony, Travis, Garza, and Kirkpatrick discussed primarily topics such as the prestige of various academic journals, the legitimacy of publications based on a doctoral dissertation, the scholarly value of oral presentations to gatherings of academics or groups of local educators, the place of education specialists within a division of mathematics and statistics, and so forth. If nothing else, the trial made it clear that measuring the value of academic work is sticky business.

Given the legitimate controversy over the quality and importance of Travis's research, the jury could reasonably have concluded that U.T.—San Antonio should have promoted her to full professor. Indeed, we assume for the purposes of this analysis that a reasonable jury could even have concluded that the adequacy of Travis's research was not the real reason that the university twice denied her promotion. The jury could have drawn the

9

conclusion that the administration disagrees with Travis's vision of the university. Trial testimony suggested that she might oppose the university's efforts to emulate major research institutions by focusing on developing doctoral programs. The administration might have thought that her energetic pursuit of improvements in education are incompatible with the division's mission of conducting pure research. Or perhaps Garza and Kirkpatrick were simply jealous of her popularity among students.

The dispositive question, however, is not whether the university made a mistake or whether it gave forthright explanations for its failure to promote. Instead, we must determine whether Travis has presented sufficient evidence that her sex was the reason for the failure to promote. We can find no more than a sliver of a suggestion that sex had anything to do with this employment dispute. We conclude that this sliver, viewed against the background of the university's evidence, is inadequate to produce an evidentiary conflict strong enough to survive a Rule 50(a) attack.

First, Travis claimed that the university treated several male professors more favorably. Lawrence Williams was the only other candidate from the College of Sciences and Engineering who applied for promotion from associate to full professor in the 1993-1994 cycle. In 1994-1995, three other males applied for and received promotions to full professor. Their success, according to Travis, indicates gender bias. Provost Garza, however, explained to the jury in detail his system for evaluating scholarly accomplishments

10

and why these four males had stronger records than Travis's. His calculations indicated that one of the males had 47 articles in "premier" journals, one had 15 such articles, one had six, and one had three. According to Garza, Travis had published only one article in a top-tier journal. The male with only three articles in a premier journal had also published a book with a university press, an accomplishment on which Garza placed significant weight.

The university could have promoted Travis along with these males; unlike many positions, there is no artificial limit on the number of full professors the university can sustain. Thus, even if the four males were indeed better candidates than Travis, the denial of promotion could still conceivably have been caused by her sex. But Travis did not give the jury any basis for concluding that sex played a role in these five promotion decisions. For the most part, the four males had stronger records, measured by the standard academic criteria outlined by Garza. We cannot turn an attack on those standards, however outmoded they might be, into a Title VII case. By themselves, minor, reasonable disagreements about scholarly qualifications do not raise an inference that the disagreements have their roots in sex discrimination.

Second, Travis urges that the jury could find disparate treatment based on a comment her dean made in 1986 that she was not "tough enough" to serve as acting director of her division. That dean, however, is no longer employed by the university. Kirkpatrick and Garza did not come to university until 1990 and 1991 respectively. This isolated comment, made more than seven

11

years before the disputed employment decisions by a person with no connection to Travis's promotion applications, has no evidentiary force.  See Ray v. Tandem Computers, Inc., 63 F.3d 429, 434 (5th Cir. 1995) ("[A] single comment, made several years prior to the challenged conduct, is a stray remark too remote in time to support an inference of sex discrimination in later employment actions."); Mooney v. Aramco Services Co., 54 F.3d 1207, 1221 (5th Cir. 1995) (finding irrelevant testimony of "sporadic and isolated" anecdotes of discrimination committed by supervisors not involved in the employment decisions at issue in the plaintiffs' suit).

Third, Travis indicated to the jury that females seeking promotion have faced discriminatory delays.  Since 1990, the university has denied promotions to two female associate professors and to one male associate professor within Travis's college. During that time, six applicants have received promotions to full professor on their first application, and all of them have been male.  This extremely small sample hardly establishes discrimination.  Moreover, the two women denied promotions were granted promotions when they applied the following year.  Travis's evidence is weak on this score because it is geared to her division, which recommended Travis for promotion at each stage on both of her applications.  The more relevant statistic is university-wide, and there the university seems to be on solid ground.  Since 1990, 12 of 25 male applicants have received promotions from associate to full professor, while 7 of 13 female applicants received the same promotions.  Because Garza and

12

Kirkpatrick must approve all of these promotions, these numbers suggest that they have not been inclined to turn women down based on their sex.

Fourth, Travis attempted to draw the jury's attention to pay disparities between her salary and Keating's salary. The university, however, accounted for these disparities by explaining that other universities had expressed interest in hiring Keating at higher salaries. To stay competitive, the university had to make it worth Keating's while to remain in San Antonio. Travis did not effectively rebut this explanation.

Travis's other references to sex discrimination during the trial were of no significance. In sum, the relative absence of evidence of sex discrimination could not have given the jury insight into whether the university allowed Travis's sex to play a role in the decision not to promote her. The jury may not have liked the academic criteria in use at the University of Texas at San Antonio, but that was not a legitimate ground for finding the university liable for a Title VII violation. When we view all of the evidence and resolve any doubts in favor of Travis, we cannot find sufficient evidence to support the jury's finding that Travis's being female caused the university to deny her a promotion.

IV.

The jury found that the university retaliated against Travis for filing her discrimination claim in three ways: (1) by denying her a promotion in the 1994-1995 cycle, (2) by removing her as

13

assistant division director, and (3) by terminating her salary supplement from the Office of Naval Research grant.

A.

As we have explained, the university satisfied its burden of producing evidence of a nondiscriminatory reason for denying Travis's second application for a promotion. Outside of disputing the merits of the promotion decision, Travis did not present evidence of retaliation. Garcia explained that, because of the pending lawsuit, he made a special effort to confirm his conclusion that Travis's file was not significantly different from the application she filed in 1993-1994. Contrary to Travis's suggestion, Garza did not testify that her suit caused him to try to find weaknesses in the 1994-1995 application. A few days after the university denied Travis's 1994-1995 promotion, the dean of the college remarked that it was because Travis "hit them with a lawsuit." But there was no evidence that the dean, who supported Travis's promotion, had any special knowledge of retaliation. In context, the remark was mere speculation.

Because of the marginal change in Travis's credentials between the unsuccessful 1993-1994 application and the 1994-1995 application, a different decision on the merits of her promotion would have been unusual. Under these circumstances, the mere fact that Travis filed an EEOC charge cannot support the jury's conclusion that the denial was retaliatory.

B.

The university explained the termination of Travis's position as assistant division director by offering the testimony of Linda Whitson, vice president of administration and planning. Whitson stated that Don Allen became division director in January of 1995 and that he quickly decided that he did not need an assistant. Travis did not contradict Whitson's claim that there were no difficulties in the relationship between Allen and Travis. More importantly, Travis did not attempt to refute the university's evidence that Allen made his decision for legitimate administrative reasons. There was no testimony that Allen even knew about Travis's EEOC charge. In other words, Travis did not carry her burden of producing evidence of retaliatory intent. The jury might speculate that Allen was cooperating with Garza and Kirkpatrick to punish Travis, but without any evidence to that effect, we cannot uphold the jury's findings.

C.

Finally, the jury found that the university retaliated against Travis when it cut off her salary supplement. According to the university, it did not discover that the supplement was in excess of Travis's base salary until it investigated her allegation of unequal pay. When the problem came to light, President Kirkpatrick took swift action: he notified the director of internal audit and asked him to make the matter top priority. Kirkpatrick's memo mentioned Travis by name so that the auditor would at least have a place to begin his investigation. Kirkpatrick also testified that

15

he contacted the general counsel of the U.T. system, the executive vice chancellor of the system, and presidents of other Texas universities to determine whether his understanding of the OMB regulation was accurate. After concluding that Travis's supplement was a violation of federal law, he decided to end it prospectively only, assuming that the federal government would not be concerned about payments Travis had already received. One other faculty member was receiving a similar grant, and the university ended it, as well.

Again, aside from the fact that the university cut off the salary supplement after it knew of Travis's suit, Travis did little to rebut the university's account of its reasons for acting. On cross-examination, defense witnesses admitted that the OMB regulation is difficult to interpret and that one might be able to make a colorable argument that Travis's grant satisfied the regulation. But Travis did not present testimony that Kirkpatrick or the university misunderstood the regulation, much less that their effort to adhere to their understanding of the regulation was pretextual. Notwithstanding Travis's accusations to the contrary, Kirkpatrick's procedures were consistent with his stated concerns. Without evidence, Travis's assertion that retaliation caused the termination of her salary supplement is merely her own subjective belief, which is insufficient to create a jury question. See Armendariz v. Pinkerton Tobacco Co., 58 F.3d 144, 153 (5th Cir. 1995) (reversing a jury verdict of discrimination and collecting

16

cases), <u>cert. denied</u>, ___ U.S. ___, 116 S. Ct. 709, 133 L. Ed. 2d 664 (1996).

V.

The judgment based on the jury verdict below is REVERSED, and a take-nothing judgment is RENDERED in favor of the university and the board of regents.

17