UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 98-30777
_____


ASHER RUBINSTEIN,

                    Plaintiff-Appellee-Cross-Appellant,


                    versus


ADMINISTRATORS OF THE TULANE EDUCATIONAL FUND; MICHAEL LYNCH;
WILLIAM C. VAN BUSKIRK,

                    Defendants-Appellants-Cross-Appellees.

_____

Appeals from the United States District Court
for the Eastern District of Louisiana
_____

July 6, 2000

Before BARKSDALE, BENAVIDES and STEWART, Circuit Judges.

BENAVIDES, Circuit Judge:

Professor Asher Rubinstein filed a Title VII and related state-law lawsuit against Tulane University, his employer, in October, 1995, asserting several grounds for relief of discriminatory and retaliatory employment decisions made against him. The district court granted summary judgment on all claims, except a later-added claim of retaliation for the 1997 school year.

This issue was submitted to a jury and the jury awarded $2500 in compensatory damages and $75,000 in punitive damages. The district court then entered judgment for Rubinstein in the aforementioned amounts, as well as for a 3.5% raise as an equitable remedy for the retaliatory act taken by Tulane. The parties now each appeal from the adverse rulings against them.

Finding the district court's rulings correct on all but the punitive damages issue, we affirm. As we further find that the $75,000 punitive damage award is excessive, we remit the award and remand the issue to the district court so as to afford Rubinstein the opportunity for a new trial on the issue of punitive damages.

I.   FACTUAL AND PROCEDURAL HISTORY

Because this appeal involves several issues of summary judgment granted in favor of the defendants, as well as a jury verdict rendered in favor of the plaintiff, we recount the facts in a light most favorable to Rubinstein's arguments so as to facilitate a review of the facts deferential to the non-movant vis-a-vis summary judgment, and deferential to the jury verdict, as rendered in favor of Rubinstein. The more notable factual disputes, however, are highlighted.

Appellee-cross-appellant Rubinstein, a Jewish man born and raised in the former USSR, is, and was at all time relevant to this action, a tenured professor of mechanical engineering at Tulane's School of Engineering. Rubinstein achieved the rank of Associate Professor in 1990, when he was granted tenure. In Rubinstein's

2

tenure recommendation it was noted that he was "an outstanding researcher" and a "satisfactory teacher."  It is undisputed that faculty evaluations at Tulane reference three major areas of performance:  teaching, university citizenship and research.  In the two years subsequent to achieving this rank, Rubinstein received raises in excess of eight percent, reflecting his outstanding research skills and contributions to the University.

Sometime in 1991, William Van Buskirk was promoted to Dean of the School of Engineering.  In 1992, Paul Michael Lynch was named Department Chair of the Mechanical Engineering department.  It is around this time that Rubinstein asserts the discrimination began.

Specifically, Rubinstein contends that the defendants-appellants-cross-appellees Tulane, Lynch and Buskirk (hereinafter "Tulane"), refused to grant him a raise in 1993, out of discriminatory animus directed toward his status as a Russian Jew. In support of this claim, Rubinstein references a conversation he had with defendant Van Buskirk concerning his 1993 raise, during which Van Buskirk apparently speculated that defendant Lynch might be discriminating against him because he was Russian and Jewish.

Sometime in 1993 or 1994, Rubinstein contends a senior faculty member of the mechanical engineering department, Prof. Robert Watts, began referring to Rubinstein as a "Russian Yankee" and a "commie."  Apparently, around this time, Watts also began making anti-Semitic remarks, such as a comment concerning placing a propeller on a yarmulke and a remark about Jewish frugality.

3

In 1994, Rubinstein received a 2.02% raise, purportedly the lowest in the department, excluding the former dean who was about to retire. That fall, Rubinstein requested consideration for promotion to the level of Full Professor. Sometime after making this request, Rubinstein complained to Van Buskirk that he was being unfairly considered with respect to raises and promotion. Rubinstein asserts that Van Buskirk responded by inquiring: "what are you going to do, sue me? Do you know what happens to people who sue their employer?" While denying ever uttering these exact words, Van Buskirk admits he inquired into whether Rubinstein planned to file suit, expressing the opinion that it would be a bad idea. Rubinstein filed what appears to be his first of two complaints with the EEOC in December of 1994.

Rubinstein's promotion request was denied in early 1995. Although Tulane acknowledges his excellent research record, the denial was purportedly based on Rubinstein's poor university citizenship, low teaching evaluation scores, and an insufficient record in mentoring students. Rubinstein, however, insists that the evidence supports the finding that the teaching evaluations were tampered with.

Rubinstein again filed a complaint with the EEOC, in April of 1995. Shortly thereafter, it appears he again received the lowest raise in the department, of approximately 2.53%. Rubinstein filed this lawsuit on October 11, 1995, asserting claims of discrimination and retaliation in the decisions concerning his

4

promotion and pay raise consideration.

In early 1996, Rubinstein's additional request for promotion was denied. Later that year, Tulane announced a campus-wide policy that only Assistant Professors and newly hired Associate Professors would be eligible for raises for the 1996-97 academic year. Rubinstein does not complain about his lack of raise for this year.

The following fall, Rubinstein's request for promotion was again denied. When the time came again for raise consideration, it appears that Tulane implemented a policy designed to use the limited raise pool to remedy inequities among the faculty both internally and with reference to salaries at comparable institutions. Rubinstein did not receive a raise for the 1997-98 academic year. He contends that despite this policy, and despite the fact that his salary was well above both Tulane's average and the national average, he was denied a raise out of retaliation for filing suit. Van Buskirk admitted as much, Rubinstein maintains.

The district court granted summary judgment on all issues raised in Rubinstein's complaint and amended complaints, except the issue of retaliation concerning the refusal to grant the 1997-98 raise. The retaliation issue was submitted to a jury, and the jury returned a verdict for Rubinstein in the amount of $2500 plus $75,000 in punitive damages.[1] Both sides now appeal the adverse decisions against them.

---

[1]The verdict was later amended by the district court, so as to include a 3.5% pay raise.

II.  ANALYSIS

Tulane and Rubinstein both assert several grounds of error, each of which will be addressed below in turn.

A.  Scope of Discovery

From the beginning of this action, Rubinstein and Tulane have disputed the appropriate breadth and scope of discovery that should be allowed in this case.  On appeal, Rubinstein maintains that the district court's decision to limit discovery to the records of the Mechanical Engineering Department constituted error.  We review orders concerning discovery under a deferential abuse of discretion standard.  See Geiserman v. MacDonald, 893 F.2d 787, 789 (5th Cir.1990); see also Hodges v. United States, 597 F.2d 1014, 1018 (5th Cir.1979).

The record reveals that the district court limited discovery to the records of the Mechanical Engineering department based on its finding that Rubinstein is similarly situated only to those in his department.  This finding is based on evidence demonstrating that salary and initial promotion decisions are made on a departmental basis.  Rubinstein maintains that this is error, as our case law requires broader discovery into university-wide tenure and promotion decisions.

The cases cited by Rubinstein in support of this contention, however, do not mandate broad discovery in all university discrimination suits.  Rather, the cases stand for the proposition that discovery orders are fact-based and must be reviewed in the

6

context of the claims at issue. Specifically, Rubinstein relies on Travis v. Bd. of Regents of Univ. of Texas, 122 F.3d 259 (5th Cir. 1997), for the proposition that university-wide statistics are more relevant than statistics limited to plaintiff's division, as similar officials are responsible for approving promotion decisions. However, importantly, and as Rubinstein fails to note in his brief, this Court reached this conclusion in ruling on a Rule 50 motion - not in settling a discovery dispute. See id. at 263. The evidence concerning school-wide practices was already admitted before the jury, and, additionally, in Travis, the plaintiff alleged sex-discrimination. Thus, this Court concluded, wider statistics concerning the treatment of women at the university generally were relevant to a determination concerning whether the defendant had engaged in illegal discrimination.

Here, the district court exercised its discretion properly in concluding that Rubinstein's requests for discovery concerning his claim that he was discriminated against for being Jewish and Russian did not implicate the salary and promotion decisions of the School of Engineering with regard to every foreign-born professor. The record reflects that initial promotion decisions are made on a departmental basis, followed by highly deferential, not *de novo*, review of these decisions by a school-wide tenure committee. Further, raise decisions are made based on the recommendation of the department chair to the Dean. Based on these pertinent

7

characteristics which distinguish the case from <u>Travis</u>, it is clear the district court did not abuse its discretion in limiting Rubinstein's discovery requests to the Mechanical Engineering department- the relevant unit of decision-making with respect to these issues.

Rubinstein further relies on <u>Duke v. University of Texas at El Paso</u>, 729 F.2d 994 (5th Cir. 1984), to support his contention that broader discovery was both necessary and required under the facts of his case. While this Court in <u>Duke</u> reversed a limited discovery order, reasoning that failure to allow discovery into the records of professors university-wide to substantiate a gender-discrimination claim constituted an abuse of discretion, the <u>Duke</u> decision again rests on the unique facts of the case.

In <u>Duke</u>, the plaintiff attempted to certify a university-wide class of similarly situated female professors, but was thwarted by the discovery order. Further, university-conducted, university-wide surveys indicated that women were paid less than their male counterparts. These facts, reasoned the Court, warranted further and broader discovery.

Importantly, however, <u>Duke</u> reaffirmed that this Court is "reluctant to find abuse when the trial court's discretion is as wide as it is in the superintendence of discovery. . . ." <u>Id.</u> at 997. Thus, despite Rubinstein's protestations otherwise, we do not feel compelled by our case law to order broader discovery, based alone on the fact that this is a university case. Given the

8

district court's careful consideration of the issue, including the persuasive conclusion that any wider discovery would only be relevant to the establishment of a prima facie case - which the district court concluded was established on the record absent additional discovery - we affirm the discovery orders as entered by the magistrate judge and ratified by the district judge.

B.   Summary Judgment Rulings

Rubinstein asserted several claims in the district court concerning allegedly discriminatory and retaliatory behavior by Tulane.   As the district court concluded, and as affirmed by our reading of the record, Rubinstein alleged that Tulane gave him comparatively lower salary increases than other faculty members in 1992, 1993, 1994, and 1995.   Additionally, Rubinstein complained that he was denied full professorship status during this time period, due to discriminatory animus as well as a desire to retaliate.   Finally, Rubinstein maintained that he did not receive a promotion or pay raise in 1997 due to retaliation.

The district court granted summary judgment on all these claims except the 1997 pay raise/retaliation claim.   Rubinstein appeals from the grant of summary judgment on his 1994 and 1995 claims, as well as his promotion claim for 1997.[2]

This Court reviews a grant of summary judgment de novo.

_____

[2]The district court dismissed the earlier claims on statute of limitations grounds as well as state law prescription grounds. Rubinstein does not appeal this aspect of the district court's ruling.

Summary judgment is proper when the evidence, viewed in the light most favorable to the non-movant, reflects no genuine issues of material fact.  Fed. R. Civ. P. 56(c).  A genuine issue of fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

As with any appeal from a grant of summary judgement, a fact-intensive review of the record is necessary, in order to discover the evidence and reasonable inferences therefrom in favor of the non-movant's claims.  We are aided in this review by the district court's carefully considered and highly detailed summary judgment orders entered on March 6, 1998, and March 20, 1998.  Our review of the dismissed claims tracks the district court's analysis and reaches the same conclusion: summary judgment was proper.

The required showing to be made by any Title VII plaintiff is familiar:  the plaintiff bears the burden of establishing a prima facie case of discrimination; upon such a showing, the burden shifts to the defendant(s) to articulate some legitimate, non-discriminatory reason for the challenged employment action; if such a showing is made, then the burden shifts back to the plaintiff to demonstrate that the articulated reason was merely a pretext to unlawful discrimination. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973).

A prima facie case may be established by a showing that the plaintiff was a member of an identifiable national origin or

religion; that he was qualified for the benefit or promotion he sought; that he was denied these benefits and such denial constitutes an adverse employment decision; and that the adverse employment decision was differentially applied to plaintiff. See Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248 (1981); Ward v. Bechtel Corp., 102 F.3d 199, 202 (5th Cir. 1997).

In this case, the parties do not dispute the first or third of these requirements: Rubinstein is clearly a member of a protected class and he clearly suffered an adverse employment decision. The parties do dispute whether Rubinstein was qualified for the benefit he sought and, further, whether the adverse employment decision complained of was differentially applied to him.

The district court found on all Rubinstein's claims evidence of qualification and evidence of differential application, at least sufficient enough to establish a prima facie case. Likewise, the district court easily found defendants offered legitimate, non-discriminatory reasons for the employment decisions at issue: Rubinstein was a poor teacher, based on student evaluations, and therefore not entitled to the promotion he sought; furthermore, as the University lacked funds to give raises to every professor, merit based raises were unavailable to those individuals with poor teaching records; finally, Rubinstein was a poor university citizen, as evidenced by his lack of participation on committees. The record clearly supports these findings. The record is replete with evidence of Rubinstein's poor teaching evaluations, as well as

11

faculty reviews and memoranda reflecting Rubinstein's poor teaching and inadequate mentoring of students, in addition to evidence of his lower participation rate in departmental committees. As such, we move to the third, and pivotal step in the McDonnell Douglas framework.

Specifically, summary judgment in this case turned on whether Rubinstein could substantiate pretext and ultimately whether he could demonstrate that discrimination lay at the heart of the complained of employment decisions. See Walton v. Bisco Indus., Inc., 119 F.3d 368 (5th Cir. 1997). The district court found some evidence of pretext, specifically with regard to Rubinstein's purported lack of university citizenship. In particular, the district court concluded that, viewing the evidence in the light most favorable to Rubinstein as the non-movant, his testimony that he was thwarted in his efforts to participate in departmental committees by Professor Lynch, by simply not being named to these committees, would tend to establish pretext. We agree that the record supports this finding.

We also agree that the record indicates that Tulane's non-discriminatory purpose in denying pay-raises based on Rubinstein's poor teaching skills is not rebutted by Rubinstein's arguments that these evaluations were not always accurate. Even if Rubinstein is correct that one or two evaluations were tampered with, the district court is correct that this does not rebut the overwhelming evidence that, even controlling for these evaluations, Rubinstein

12

received substantially lower evaluations than other, similarly situated professors. Rubinstein has not established pretext as to this issue.

Even on the issue for which Rubinstein demonstrated some pretext, we find an overall lack of any evidence of discriminatory intent. While we are mindful of the Supreme Court's recent admonition that Title VII plaintiffs need not always present evidence above and beyond their prima facie case and pretext, see Reeves v. Sanderson Plumbing Products, Inc., 2000 WL 743663, *5, discrimination suits still require evidence of discrimination. On this record, Rubinstein has failed to meet his burden of producing any evidence of discrimination sufficient to survive summary judgment, and his evidence to rebut the non-discriminatory reasons offered by Tulane is not so persuasive so as to support an inference that the real reason was discrimination. In fact, the only evidence offered by Rubinstein in support of his claims of discriminatory intent relate to the comments made by Professor Watts, a member of the relevant committees responsible for making promotion and pay-raise decisions, that Rubinstein was a "Russian Yankee" and that Jews are thrifty, as well as an isolated remark by a Professor Bruce, also a member of the relevant committees, that if "the Russian Jew" could obtain tenure, then anyone could.

These comments, standing alone, will not defeat summary judgment on Rubinstein's claims of discrimination in the promotion and pay-raise decisions. This Court held, in Brown v. CSC Logic,

13

Inc., 82 F.3d 651, 655 (5th Cir. 1996), that, in order for comments in the workplace to provide sufficient evidence of discrimination, they must be "1) related [to the protected class of persons of which the plaintiff is a member]; 2) proximate in time to the [complained-of adverse employment decision]; 3) made by an individual with authority over the employment decision at issue; and 4) related to the employment decision at issue." In this case, Rubinstein fails to offer evidence that the comments he complains of are either proximate in time to his failure to receive raises or promotions, or that the comments are related to the employment decisions at issue. The only evidence he offers is that the comments were, in fact, made. Our careful review of the record indicates that these comments are best viewed under our Circuit precedent as stray remarks, thus not warranting survival of summary judgment.[3] See Krystek v. University of Southern Mississippi, 164 F.3d 251, 256 (5th Cir. 1999). Summarized, our careful review of all the summary judgment evidence presented, viewed in the best light to the non-movant's claims, mandates the conclusion that the evidence taken together does not raise a legitimate fact issue as to discriminatory intent with respect to Rubinstein's discrimination claims.

---

[3]Rubinstein references a few other comments made by various members of the faculty concerning women and other minority groups. Many of these comments are ambiguous at best in their meaning, and, in any event, inapplicable to the case at bar, as they do not relate to the protected class of which Rubinstein is a member.

14

Rubinstein further appeals from the district court's grant of summary judgment on his remaining retaliation claims. These claims apparently relate to his lack of pay raise in 1995, and the refusal to promote after 1994. However, the district court, in its second Order and Reasons partially granting summary judgment concludes that the only evidence of retaliation presented concerns Tulane's failure to grant him a pay-raise in 1997. Given that Rubinstein compresses these issues and speaks generally to the district court's error in granting summary judgment on his retaliation claims, we review them together, as did the district court, and we similarly conclude that, as discussed above, Rubinstein presented no evidence of discrimination or retaliation with respect to the earlier pay raise and promotion decisions. Accordingly, we affirm the grant of summary judgment on all issues presented by Rubinstein.

C. Motion for Judgment as a Matter of Law

At the conclusion of the trial, Tulane moved for judgment as a matter of law (JMOL). The district court denied this motion and Tulane appeals.

This Court reviews a district court's denial of a motion for judgment as a matter of law de novo. See Travis v. Board of Regents of the Univ. of Tex. Sys., 122 F.3d 259, 263 (5th Cir.1997). "A motion for judgment as a matter of law ... in an action tried by jury is a challenge to the legal sufficiency of the evidence supporting the jury's verdict." Harrington v. Harris, 118

15

F.3d 359, 367 (5th Cir.1997) (internal quotations and citation omitted).  This Court tests jury verdicts for sufficiency of the evidence under the standards set forth in Boeing Co. v. Shipman, 411 F.2d 365, 374 (5th Cir.1969) (en banc), overruled on other grounds, Gautreaux v. Scurlock Marine, Inc., 107 F.3d 331 (5th Cir.1997) (en banc).  Under Boeing, we consider "all of the evidence - not just that evidence which supports the non-mover's case - but in the light and with all reasonable inferences most favorable to the party opposed to the motion.  If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting [judgment as a matter of law] is proper."  Id.

As discussed above, this Court applies the burden-shifting framework expounded by the Supreme Court in  McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), and Texas Department of Community Affairs v. Burdine, 450 U.S. 248 (1981), to retaliation cases.  However, we need not now parse the evidence into discrete segments corresponding to a prima facie case, an articulation of a legitimate, nondiscriminatory reason for the employer's decision, and a showing of pretext.  "When a case has been fully tried on the merits, the adequacy of a party's showing at any particular stage of the McDonnell Douglas ritual is unimportant."  Molnar v. Ebasco Constructors, Inc., 986 F.2d 115, 118 (5th Cir.1993) (citation omitted).  A Title VII plaintiff bears the burden of

16

proving not only that the employer's purported reasons for taking an adverse employment action are pretextual, but also that the employer engaged in illegal discrimination or retaliation. Hicks, 509 U.S. at 511. Thus, applying Boeing's sufficiency of the evidence standards, this Court must examine whether the plaintiff has met his ultimate burden of proving that the adverse employment action complained of resulted from retaliatory intent.

Again, we note the Supreme Court's recent admonition to the Courts of Appeals sitting in review of jury verdicts in such cases: "Under Rule 50, a court should render judgment as a matter of law when 'a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue'. . . . It therefore follows that, in entertaining a motion for judgment as a matter of law, the court should review all of the evidence in the record." Reeves, 2000 WL 743663, *10 (citation omitted). The jury made several findings in this case: first, the jury found by a preponderance of the evidence that Rubinstein's filing of a discrimination lawsuit and/or EEOC charge was a motivating factor in Tulane's decision to deny his pay raise in 1997-98; second, the jury found by a preponderance of the evidence that Tulane also had a legitimate, non-retaliatory motive for the denial of the 1997-98 pay raise; and, third, the jury found by a preponderance of the evidence that Tulane would not have made the same decision to deny his raise absent the existence of a retaliatory motive.

17

In this case, Rubinstein testified that Dean Van Buskirk, in depositions taken pursuant to this lawsuit, stated clearly that he denied Rubinstein a raise in 1997 because Rubinstein filed suit, a step Van Buskirk apparently believes good colleagues do not take. Van Buskirk, also testifying at trial, confirmed that his deposition testimony corresponded to Rubinstein's account, although he attempted to distance himself from the full meaning of these comments. We find that this evidence, clearly presented at trial and viewed with reference to the entire trial record, could be no more direct on the issue of retaliation. As such, the jury was presented with more than sufficient evidence from which to conclude that Tulane illegally retaliated against Rubinstein.

In addition to complaints concerning the sufficiency of the evidence, the defendants complain at length about the nature of the jury interrogatories and resultant findings. Specifically, they challenge the consequences of these jury findings to this Court's requirement that Title VII retaliation plaintiffs prove that but for retaliation, the adverse employment action would not have occurred. See Long v. Eastfield College, 88 F.3d 300, 305 n.4 (5th Cir. 1996). The parties seem to agree that the 'but for' test is required by this Circuit's precedent. See id. ("The ultimate determination in an unlawful retaliation case is whether the conduct protected by Title VII was a 'but for' cause of the adverse employment decision" (citing McDaniel v. Temple Indep. Sch. Dist., 770 F.2d 1340, 1346 (5th Cir.1985))). In other words, even if a

18

plaintiff's protected conduct is a substantial element in a defendant's decision to terminate an employee, no liability for unlawful retaliation arises if the employee would have been terminated even in the absence of the protected conduct. Jack v. Texaco Research Ctr., 743 F.2d 1129, 1131 (5th Cir.1984).

Tulane, thus, complains that the application of mixed-motive law to the facts of this case tainted the jury's findings and mandates reversal, given the above requirement in retaliation cases that the plaintiff prove but-for causation. The dispute is thus: The district court apparently concluded that 42 U.S.C. §2000e-2(m) (Section 107), and the corresponding remedial provision, apply to Rubinstein's retaliation claim. This section allows for limited remedies in cases where plaintiffs are able to prove that one motive for the adverse employment action is discrimination, even when the defendant is able to prove that the action would have been taken in the absence of the discriminatory motive. These amendments were passed by Congress in the wake of Price Waterhouse v. Hopkins, 490 U.S. 228 (1989), a case in which the Supreme Court held that all discrimination plaintiffs must prove that but for the discriminatory intent, the adverse employment decision would not have been made.

This Circuit has not had opportunity to address the question of whether the amended statute applies in retaliation cases. The district court in this case determined that it does, while three circuit courts have reached the contrary result. See McNutt v.

19

<u>Board of Trustees of Univ. of Ill.</u>, 141 F.3d 706 (7th Cir. 1998);

<u>Woodson v. Scott Paper Co.</u>, 109 F.3d 913, 932-36 (3d. Cir.), <u>cert.</u>

<u>denied</u>, 118 S.Ct. 299 (1997); <u>Tanca v. Nordberg</u>, 98 F.3d 680, 682-

85 (1st Cir.), <u>cert. denied</u>, 117 S.Ct. 1253 (1997). Tulane now

asserts that error resulted from the district court's consideration

of this issue in instructing the jury and drafting the jury

interrogatories.

Rubinstein, not surprisingly, disagrees as to the consequences

of the district court's application of this reasoning in drafting

the jury interrogatories in this case. Tulane emphasizes the

second jury finding: Tulane had a legitimate, non-retaliatory

motive for the denial of the pay raise at issue.[4] However, their

discussion fails completely to reference the third finding: Tulane

would not have made the complained of adverse employment decision

in the absence of the retaliatory motive. Rubinstein is correct

that he does not have to prove that his "protected conduct was the

sole factor in motivating [Tulane's] challenged decision." <u>Long</u>,

88 F.3d at 305. All that is left for us to determine is whether

---

[4]The three relevant jury interrogatories were:
1. Do you find by a preponderance of the evidence that Asher Rubinstein's filing of a discrimination lawsuit and/or EEOC charge was a motivating factor in Tulane's decision to deny Asher Rubinstein a pay raise in 1997-98?
2. Do you find by a preponderance of the evidence that Tulane also had a legitimate, non-retaliatory motive for the denial of the 1997-98 pay raise?
3. Do you find by a preponderance of the evidence that Tulane would have made the same decision to deny Asher Rubinstein a raise despite the existence of a retaliatory motive?

20

the jury verdict is supported by sufficient evidence, under the test outlined above.  As we have already concluded that it does, the verdict on retaliation will be allowed to stand.

Thus, we respectfully decline the invitation to address this issue now.  Simply stated, this is not the case to decide a matter of first impression, when it is not clearly presented and it is unnecessary to our decision on the issues before us.  Whether error or not, the error was certainly harmless, given the jury's explicit finding of but-for causation pursuant to interrogatory three.  The district court's understanding of mixed motive analysis may have resulted in a jury interrogatory form that was over-extensive (so as to determine the multiple reasons underlying the adverse employment action in question), but ultimately the jury rejected the option of returning a verdict based on mixed motive and instead found that absent the retaliatory motive, Rubinstein would have received his raise. D.  Jury Instructions and Interrogatories

Tulane next complains that the jury instructions[5] and jury interrogatory forms were improper because they allowed the jury to consider mixed motive analysis.

Challenges to jury instructions are reviewed to determine

---

[5]As Tulane notes in its brief, the jury instructions are not preserved on appeal, as apparently the transcript of the charging conference has been misplaced.  However, we can infer from the instructions submitted by the parties and the jury interrogatories the nature of the disputed instructions, given that Tulane's concern focuses on the application of mixed-motive law to the retaliation claim in this case.

21

whether the court's charge, as a whole, is a correct statement of the law and clearly instructs jurors on the legal principles at issue. See United States v. Moreno, 185 F.3d 465, 476 (5th Cir.1999). Further, and importantly to this case, review of jury instructions is for harmful error. Even if an instruction erroneously states the applicable law or provides insufficient guidance, this Court will not disturb the judgment unless the error could have affected the outcome of the trial. See Arleth v. Freeport-McMoran Oil & Gas Co., 2 F.3d 630, 634 (5th Cir.1993); Colburn v. Bunge Towing, Inc., 883 F.2d 372, 377 (5th Cir.1989). This Court affords district courts great latitude in framing and structuring special interrogatories and reviews the formulation of jury interrogatories for abuse of discretion. EEOC. v. Manville Sales Corp., 27 F.3d 1089, 1096 (5th Cir.1994).

Tracking our discussion of this issue above, we will assume, arguendo, that the district court abused its discretion, by misapplying the law, in instructing the jury on mixed motive. However, as stated, this error was harmless, in that the jury made an explicit finding as to 'but for' causation. As such, this issue does not require reversal.

E. Punitive Damages

The jury awarded Rubinstein $75,000 in punitive damages upon answering in the affirmative interrogatory 5, which asked: "Do you find by a preponderance of the evidence that Tulane acted with malice or with reckless indifference to the rights of Asher

22

Rubinstein in denying him a pay raise in 1997-98?" Tulane argues that this award of punitive damages is contrary to controlling law and specifically the Supreme Court's opinion in Kolstad v. American Dental Association, 119 S.Ct. 2118 (1999), decided subsequent to the trial in this case. Rubinstein counters that such an award is authorized by statute and well within reason on the facts of this case.

Prior to 1991, Title VII provided no authority for an award of punitive or compensatory damages. See Landgraf v. USI Film Products, 511 U.S. 244, 252-253 (1994). With the passage of the 1991 Act, however, Congress provided for additional remedies, including punitive damages, for certain classes of Title VII and Americans with Disabilities Act violations. These awards are limited, however, to cases of "intentional discrimination." There is no dispute that this is such a case.

The availability of punitive awards, however, is further qualified: "A complaining party may recover punitive damages under this section against a respondent (other than a government, government agency or political subdivision) if the complaining party demonstrates that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981(a). The Supreme Court has stated that the very structure of this amendment "suggests a congressional intent to authorize punitive awards in only a subset of cases

23

involving intentional discrimination." Kolstad v. American Dental Ass'n, 119 S.Ct. at 2124. "Congress plainly sought to impose two standards of liability--one for establishing a right to compensatory damages and another, higher standard that a plaintiff must satisfy to qualify for a punitive award." Id.

Under this reading of the relevant statute - the Supreme Court's reading - the employee must demonstrate that the employer acted with "malice or with reckless indifference" to appellant's federally protected rights.

Our inquiry, however, does not end there. Rather, the employee must satisfy an additional requirement as set out in this recent articulation of the necessary showing to obtain punitive damages under Title VII: the requirement of agency. Relevant to this case, the evidence must support a finding that the malfeasing agent served in a "managerial capacity" and committed the wrong while "acting in the scope of employment." Kolstad, 119 S.Ct. at 2127.

We begin our analysis, however, by considering the consequences of the final consideration required, as articulated in Kolstad - what might be termed application of the good-faith exception. In Kolstad, the Supreme Court held that "in the punitive damages context, an employer may not be vicariously liable for the discriminatory employment decision of managerial agents where these decisions are contrary to the employer's 'good-faith efforts to comply with Title VII.'" Id. at 2129. In this case,

Rubinstein's evidence of retaliation concerns comments made by the Dean of his department about the consequences of filing suit against Tulane. Tulane argues, relying on Kolstad, that whether it can properly be held responsible for these comments, and the retaliatory result of these comments, depends on whether Tulane made a good-faith effort to comply with Title VII. It further contends that, as it has made such an effort, punitive damages are forbidden by Kolstad.

We disagree for the simple reason that Tulane presented no evidence at trial, and the record as a whole offers no evidence, to establish Tulane's efforts to comply with Title VII. However, as Kolstad was decided subsequent to the jury trial in this case, we consider the effect of applying the ruling in Kolstad to a previously rendered jury verdict.

Following the decision in Kolstad, this Court had opportunity to consider the consequences of retroactively applying the good-faith language on a punitive damages award in a Title VII case. See Deffenbaugh-Williams v. Wal-Mart Stores, Inc., 188 F.3d 278 (5th Cir. 1999). In Deffenbaugh-Williams, the jury returned a verdict for the plaintiff which included a $100,000 punitive damages award upon a finding that Wal-Mart had discriminated against the plaintiff based on her race with malice or with reckless indifference to her federally protected rights.[6] The district

---

[6]The punitive damages award was previously reduced to $75,000 by the panel upon the initial hearing of the case, see 156 F.3d

25

judge granted Wal-Mart's motion for judgment as a matter of law (JMOL) with respect to the punitive damages, relying on <u>Patterson v. P.H.P. Healthcare Corp.</u>, 90 F.3d 927 (5th Cir. 1996) (discussing in detail the depth of management participation required to sustain an award of punitive damages). An appeal was taken and a panel of this Court affirmed the liability finding and the award of compensatory damages, while reversing the post-verdict JMOL on punitive damages, although a remittitur was ordered. 156 F.3d 581, 586-91 (5th Cir. 1998).

The Supreme Court subsequently granted certiorari in <u>Kolstad</u>. As such, this Court, en banc, granted rehearing and ordered briefing on the punitive damages question. After <u>Kolstad</u> was rendered in June of 1999, the en banc Court remanded to the panel the punitive damages question. It is this remanded opinion that guides our decision today.

Tulane maintains that this is not a punitive damages case, in light of <u>Patterson</u> and <u>Kolstad</u>, and, as such, the punitive damages award should be vacated by this Court. We are convinced, however, as was the <u>Deffenbaugh-Williams</u> panel, that Tulane was on notice "that faithfully-adhered-to non-discrimination polic[ies] may bar imputing punitive damages liability to an employer when its employee acts with malice or reckless indifference," and thus

---

581, 594-98 (5th Cir. 1999), a reduction which was subsequently upheld on remand from the en banc court. <u>See</u> <u>Deffenbaugh-Williams</u>, 188 F.3d at 286.

cannot now claim the benefit of this newly clarified standard in requesting a new trial or other remedies. Deffenbaugh-Williams, 188 F.3d at 283. "In short, Kolstad's imputation holding was not such a sudden shift as to require, in fairness, giving [Tulane] an opportunity to present additional evidence." Id. at 284. Therefore, we will consider Tulane's motion for judgment as a matter of law, with respect to punitive damages, by applying Kolstad, in full to the record before us, without concern that our retroactive application is unfair.[7]

In the first instance, we must determine whether the retaliatory act at issue was committed by a managerial agent acting within the scope of employment. Tulane does not seriously contest this issue and we find easily, based on the record, that Dean Van Buskirk, the agent primarily responsible for ratifying the decision not to grant Rubinstein a raise, was acting within the scope of his employment in making this decision. As the record reflects, it is ultimately the dean of each department at Tulane who is responsible for entering any pay-raise decisions. In this case, the Dean of the Engineering Department, Van Buskirk, refused to grant

_____

[7]As we noted in Deffenbaugh-Williams, "[t]his conclusion is consistent with post-Kolstad opinions from other courts, none of which have required a new trial under its standards after a jury considered the issue pre-Kolstad. See, e.g., Kimbrough v. Loma Linda Development, 183 F.3d 782, 784 (8th Cir. 1999) (affirming punitive damage award); Blackmon v. Pinkerton Sec. & Investigative Services, 182 F.3d 629, 636 (8th Cir. 1999) (reversing district court's JMOL on punitive damages and remanding for reinstatement, finding, inter alia, employer's remedial response inadequate).

27

Rubinstein a raise. Without question, this decision was made in his capacity as a managerial agent and in the scope of his employment.

Kolstad instructs that we must next consider whether the bad act complained of was committed with malice or with reckless indifference to the complainant's federal rights. As we know now, from Kolstad, plaintiffs are not required to make an additional showing of egregiousness. Kolstad, 119 S.Ct. at 2129 ("We have concluded that an employer's conduct need not be independently 'egregious' to satisfy § 1981a's requirements for a punitive damages award, although evidence of egregious misconduct may be used to meet the plaintiff's burden of proof.") Thus, Tulane's insistence to the contrary must fall on deaf ears.

Rather, we will only search the record for evidence that Tulane's agent was motivated by malice or reckless indifference to Rubinstein's federal rights. We find, on the trial record, Rubinstein made such a showing. The evidence indicates that Dean Van Buskirk denied Rubinstein a raise because he "hauled colleagues into court to try to resolve differences." Whatever else this evidences, it certainly indicates a healthy disdain for Rubinstein's rights to seek redress in the courts for perceived wrongs adequate to meet the standard of reckless indifference at least, if not outright animus, towards those rights. The jury was well within its purview to so find, and we will not disturb this finding on appeal.

28

Finally, as noted earlier, Tulane has not presented and the record does not reflect any evidence of its good-faith efforts to comply with Title VII. As our analysis above leads us to conclude that Tulane had ample notice and opportunity to do so, we will not allow Tulane to raise this issue for the first time on appeal. As such, this is an impotent defense to the award of punitive damages and we will not disturb the award of those damages on this record.

Our inquiry, however, cannot end here. While we conclude without controversy that Rubinstein is entitled to an award of punitive damages on the facts of this case, we must nevertheless pause to consider Tulane's arguments that the amount of the award is excessive. The jury awarded Rubinstein $2500 in compensatory damages for lost wages and benefits and the jury awarded nothing for emotional damage. The jury then awarded $75,000 in punitive damages. Tulane insists that this award is grossly excessive and requests that we either vacate the award, grant a new trial, or, alternatively, grant a remittitur on the punitive damages issue.

Tulane moved for judgment as a matter of law at the conclusion of the trial. The judge denied this motion without comment or opinion. Accordingly, we review this claim, applying the usual standard, as articulated above.

Relying primarily on our decision in Patterson, Tulane maintains that the award of punitives in an amount thirty times the award of compensatory damages is excessive and 'close to the line' of constitutional propriety. Rubinstein counters that given the

29

reprehensibility of the conduct at issue, the award, in equity, of a 3.5% pay raise, and the comparable nature of this award to others in this Circuit, the amount is within the realm appropriate for such a case.

In the original panel opinion in <u>Deffenbaugh-Williams v. Wal-Mart Stores, Inc.</u>, 156 F.3d 581 (5th Cir. 1998), this Court extensively discussed the appropriate appellate approach to assessing a punitive damages award.[8] <u>See</u> <u>id.</u> at 594-98.

As in that case, Rubinstein does not respond in his brief to Tulane's request that we either remit or remand the award of punitives. As in that case, Tulane mentions primarily in passing that the award of $75,000 exceeds the Constitutional limit as prescribed by the Due Process Clause. As in that case, the parties rely on a three-tiered analysis provided by <u>Patterson</u> and the Supreme Court's opinion in <u>BMW of North America, Inc. v. Gore</u>, 517 U.S. 559 (1996), without acknowledging that <u>BMW</u> concerned the constitutional limits of a punitive damages award, not statutory or otherwise. As in that case, this matter was tried to a jury and yet the parties fail to acknowledge that <u>Patterson</u> concerned a bench trial, raising different and fewer Seventh Amendment considerations. Finally, as in that case, the parties fail to

---

[8]As we detailed above, the panel opinion was taken en banc, then reinstated except for the punitive damages issue. The panel subsequently issued an opinion which adopted its former reasoning with respect to the amount of punitive damages the law would allow. <u>See</u> <u>Deffenbaugh-Williams</u>, 188 F.3d at 285.

fully develop the numerous considerations that must underlie an application of BMW's standards for assessing the Constitutionality of a punitive damages award.

Thus, we find the reasoning of Deffenbaugh-Williams instructive on the issue of excessiveness, given the critical similarities between these cases, and we apply its reasoning *in toto*, and similarly conclude that a more fully developed approach to assessing the Constitutionality of a punitive damages award awaits a future day. In so doing, we agree with the Deffenbaugh-Williams court that special consideration must be given to Rubinstein's failure to respond to the remand or remit issue. He simply offers us no guidance as to whether if we deem the award excessive he is entitled to a new trial on this issue, or whether, as an alternative, we should remit the award or leave it to the district court for further consideration. As the Deffenbaugh-Williams court stated, "efficiency and economy for the parties and the courts" dictate that we settle this issue now, on appeal, rather than through further proceedings in the district court. 156 F.3d at 597.

The first factor to consider and "'[p]erhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendants's conduct.'" Deffenbaugh-Williams, 156 F.3d at 597 (quoting BMW, 517 U.S. at 575). This case concerns one act of retaliation.

31

Rubinstein was denied a pay-raise of approximately 3.5% as a result of seeking redress for perceived acts of discrimination. The record indicates that the decision-maker responsible for setting Rubinstein's raise punished him for exercising his rights, in an act of certain ill-will towards Rubinstein. Tulane argues, however, that the record supports, and the jury also found, that other reasons existed for Rubinstein's lack of pay-raise. While this may be true, it does nothing to undermine our conclusion that the act of the Dean in expressly acknowledging that he was undertaking what should be a performance-based employment decision on the basis of an employee's exercise of his federal rights is sufficient to demonstrate a high degree of reprehensibility under the first BMW factor.

The second factor to consider is whether the punitive damages bear a reasonable relationship to the compensatory damages awarded. See Id. We bear in mind, in applying this factor, that this court has not and indeed cannot "'draw a mathematical bright line between [] constitutionally acceptable and [] constitutionally unacceptable'" levels of punitive damages "'that would fit every case.'" Id. (quoting Pacific Mut. Life Ins. Co. v. Haslip, 499 U.S. 1, 18 (1991)). "'We can say, however, that general concerns of reasonableness . . . properly enter into the constitutional calculus.'" Id. Thus, we are required to consider the disparity between the harm suffered by the plaintiff and the punitive damages awarded.

While no bright line exists, this award is clearly outside even the gray areas of the demarcation between acceptable levels of damages and unacceptable levels. While we acknowledge Rubinstein's arguments that he was awarded a 3.5% pay raise in addition to $2500 in compensatory damages, we cannot fairly consider this award in weighing the appropriateness of the punitive damages awarded. The pay-raise is prospective relief to correct a wrong previously committed, while the punitive damages award is properly the tool used to correct the retrospective harm. Accordingly, we must consider the appropriateness of the amount at issue here with reference only to the compensatory damages awarded for the prior harm.

As previously stated, the punitive damages awarded were in an amount thirty times the compensatory damages. While there is no magical multiplier, a multiplier of thirty is unreasonable on the facts of this case. Rubinstein, while no doubt, and understandably, frustrated and angry as his testimony indicates, did not lose his tenured position at the University, nor was he demoted or otherwise forced to suffer consequences to his status at the university. We find that the employment decision denying Rubinstein a small percentage raise, while illegally made, was not so exceptional as to justify a multiplier of thirty. On the facts of this case the ratio alone of thirty-to-one is so disproportionate as to "raise a suspicious judicial eyebrow," and require a remittitur. TXO Production Corp. v. Alliance Resources

33

Corp., 509 U.S. 443, 481 (1993) (O'Connor, J., dissenting).

Having found that the award fails to satisfy the second requirement, we need not examine the third prong of the BMW test.

Thus, our application and analysis of the BMW factors to the record in this case, as outlined and applied in Deffenbaugh-Williams in the context of a non-constitutional challenge to punitive damages, compels our finding that the punitive damages awarded by the jury were excessive. The award is high when considered against the harm to be remedied. As such, we remit the damages to $25,000. While we acknowledge that this remittitur leaves the award at a level ten times the compensatory damages, we note that the Supreme Court has indicated that a ratio of ten to one does not necessarily "'jar one's constitutional sensibilities.'" TXO, 509 U.S. at 462 (quoting Haslip, 499 U.S. at 18.) Moreover, when considered as an absolute amount as opposed to a comparative ratio, we find that a $25,000 punitive damages award is reasonable given the illegal conduct by the Dean, admitted to on the record and found by the jury to constitute malicious or reckless indifference to Rubinstein's federal rights. Such an award is appropriate in this case and does not test the boundaries of the Due Process Clause.

F. Compensatory Damages

Rubinstein additionally complains on appeal that the jury erred in refusing to award him compensatory emotional damages. We do not agree.

In this case, the only evidence submitted to the jury concerning Rubinstein's emotional state resulting from the 1997 pay-raise denial is Rubinstein's own testimony that he was angry and moody as a result of not receiving a raise.[9] However, as this Court has noted "[h]urt feelings, anger and frustration are part of life." Patterson, 90 F.3d at 940. As no other evidence was offered to establish the emotional impact of this retaliatory act, we find no error in the jury's decision not to award Rubinstein compensatory emotional damages.

III. CONCLUSION

For the foregoing reasons, we AFFIRM the district court's rulings on discovery, summary judgment, emotional damages, jury instructions and interrogatories, and Tulane's motion for judgment as a matter of law. We further reduce the amount of punitive damages awarded from $75,000 to $25,000, and REMAND this issue alone to the district court to afford Rubinstein an opportunity either to accept the remittitur, in which case the district court shall grant it and enter judgment accordingly, or refuse it, in

---

[9]Specifically, in response to a question from counsel concerning his mental state, Rubinstein stated:
Well, it made me very upset, very angry. It's like, basically, I'm trying to do everything I am told to do. . . . It's like you get a feeling like you're standing in front of the world, you do everything possible, you want to believe that here is somewhere some kind of fair evaluation. You want to do anything possible to overcome this, and no matter what you do, you don't get anywhere; you get another wall. The wall keep [sic] on getting higher and higher, no matter how you approach it. That's the feeling. It makes me very angry, very upset about it. . . . It make [sic] me moody at home.

35

which case the district court shall grant a new trial solely on the issue of punitive damages.

AFFIRMED; REMITTITUR OF PUNITIVE DAMAGES; REMANDED.