Barbara **MERCER**, Plaintiff,

v.

**CAPITAL MANAGEMENT AND REALITY, INC.**, Defendant.

No. 6:05 CV 404.

United States District Court, E.D. Texas, Tyler Division.

Nov. 2, 2006.

621

## MEMORANDUM ORDER
## AND OPINION

LEONARD DAVIS, District Judge.

This case is before the Court on motion for summary judgment (Docket No. 34). Having considered the motions and the summary judgment record and having heard arguments of counsel, the Court **GRANTS** Defendant's motion.

### BACKGROUND[1]

This case arises out of Defendant Capital Management's ("Capital Management")

---

1. Because this is before the Court as a motion for summary judgment, the Court views the facts in the light 1 most favorable to Mercer.

employment termination of Plaintiff Barbara Mercer ("Mercer") on January 10, 2005. Mercer brought claims for (1) age discrimination under the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 623(a)(1) ("ADEA") and (2) religious discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII").

Mercer was employed as the on-site manager for Lone Star Self Storage in Tyler, Texas for nine years prior to its sale on October 29, 2004, when Equity Based Services, Inc. ("EBS") purchased Lone Star Self Storage and Northwest Self Storage. After the sale Capital Management assumed operational control of both facilities pursuant to a contract with EBS.

Mercer and her husband lived at the Lone Star facility in an apartment connected to the main office. Mercer was contacted by Don Toler, Capital Management's Vice President, after the sale. Toler told Mercer that he had heard good things about her and that Capital Management wanted her to remain as the Lone Star facility manager under Capital Management. Toler met with Mercer at the Lone Star facility on October 29, 2005. Mercer had decorated the facility office with numerous ceramic angel and cherubic figurines. Mercer had sold figurines on occasion to customers, although she did not advertise them for sale. Mercer claims that Toler told her that she was "a little on the overly religious side" and that the figurines were offensive. Toler contends that he merely asked her to "tone it down." Mercer subsequently removed the figurines. At no other time did any Capital Management employee make any comments regarding Mercer's religious beliefs.

Mercer filled out an employment application with Capital Management on November 2, 2005. In the application, Mercer acknowledged an initial 90-calendar-day probationary period. Mercer was sixty years old when Capital Management hired her. Mercer's direct supervisor at Capital Management was Albert Ankney.

Mercer argues that she began receiving conflicting orders from Toler, Ankey, and EBS owners Eric Kaplan and Steve Kaplan. First, Mercer claims that Toler instructed her change the hours of the facility, but she did not have authorization to change the hours on the sign and the instruction was later countermanded by Steve Kaplan. Second, Toler instructed Mercer to place lock and key deposits in an on-site cash fund; Mercer claims that Steve Kaplan told her not to do so.

Mercer contends that Steve Kaplan asked her to "document things with him." Mercer admits that she began taping phone conversations with her supervisors, but argues that she did so in an effort to document conflicting instructions. There is also evidence of strain between EBS and Capital Management at other facilities. Jane Peterson, a Capital Management employee who worked at an EBS facility in Florida, suffered similar chain-of-command issues. In her affidavit, Peterson testified that she was given conflicting instructions from EBS and Capital Management, that EBS constantly called her to find out what Capital Management was instructing her to do, and that EBS had asked to be advised of everything. Peterson further testified that she kept copies of paperwork and created memos to "cover herself" with Capital Management. Capital Management admitted to chain-of-command problems at oral argument.

There were other difficulties in Mercer's relationship with Capital Management. Capital Management instructed Mercer to use a new address stamp; Mercer claims that she was not authorized to obtain it and it was not provided to her. Capital Management claims that Mercer failed to

implement a rent increase as directed. Mercer disagreed with Capital Management's policy that she could not work more than eight hours in a day without prior approval even though she was not allowed to leave the premises for lunch. Mercer also disagreed with Capital Management's position that Mercer's husband must become an employee to be paid for any work at the facility. The previous owner had paid Mercer's husband, who was on social security disability pay, for occasional maintenance work without making him an employee. Finally, Mercer did not set up a new computer that Capital Management had purchased after learning that Mercer was using her own office equipment at the facility. Mercer claims that Capital Management instructed her to leave the computer in the box until they sent someone to set it up, but no one came. Capital Management later sent a technician to install new office software; Mercer had him install it on the old computer.

Mercer wrote a letter to Toler on December 18, 2004, enumerating her complaints about Capital Management. Mercer copied the letter to Steve and Eric Kaplan of EBS. On December 28, 2004, Mercer sent a fax to Steve Kaplan in which she stated that Capital Management was "going to cost [EBS] severely if something is not done very soon." Toler and Steve Kaplan discussed whether to terminate Mercer, but the ultimate decision to terminate her was Capital Management's. Ankney terminated Mercer on January 10, 2005.

On January 10, 2005, Capital Management only told Mercer that her services were no longer needed. Approximately one month later, Capital Management provided Mercer a Termination Notice stating the grounds for her termination as "[i]nsubordination & 90 day probationary work not performed to standards, discussed salaries with other managers against company policy, recorded phone conversations between upper [management] without knowledge or consent, loaded proprietary software and tenant files on personal PC instead of new PC supplied by owner."

Mercer denies ever discussing salaries with other Capital Management employees. Mercer admits to taking the office computer containing Capital Management's software and customer information after she was terminated. Mercer contends that she mistakenly believed that the old computer was hers when she was terminated. Mercer later returned the computer and all proprietary information therein to Capital Management. Capital Management admits that Mercer's retention of the computer did not contribute to Capital Management's decision to terminate her.

Mercer and her husband did not immediately vacate the on-site apartment after she was terminated. Capital Management sent two female employees in their thirties to run the facility until Mercer vacated. Mercer saw the two women at the facility for a few weeks. After Mercer left, Jesse and Dee Marshall moved onto the property. The Marshalls had previously managed the Northwest property; Jesse Marshall is older than Mercer, and Dee Marshall is less than three years younger than Mercer.

Mercer claims that she was the only employee terminated as a result of the conflict between EBS and Capital Management and that her termination was motivated by age and religious discrimination. Mercer supports her age-based discrimination claim with Peterson's affidavit, in which Peterson testified that she believed Capital Management "felt threatened by older employees" and that she saw "many young kids" working at facilities operated by Capital Management. Mercer also

claims that Ankney told Jesse Marshall that he expected Capital Management to terminate Marshall because "higher ups" at Capital Management or EBS wanted younger, "bubblier" employees.

## APPLICABLE LAW

*Summary Judgment Standard*

Any party to a civil action may move for summary judgment upon a claim, counter-claim, or cross-claim as to which there is no genuine issue of material fact and upon which the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(C). The moving party bears the initial burden of identifying those portions of the pleadings and discovery in the record that it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A fact is material if it might affect the outcome of a case under governing substantive law and an issue is genuine if a reasonable fact-finder could return a verdict for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Once the moving party has made this initial showing, the burden shifts to the non-movant to show that summary judgment should not be granted. *Celotex*, 477 U.S. at 325, 106 S.Ct. 2548. The non-movant may not rest upon mere allegations or denials in its pleadings, but must set forth specific facts showing a genuine issue for trial. *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505. The non-movant must "identify specific evidence in the record and [ ] articulate the precise manner in which the evidence supports his or her claim." *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir.1998). On a motion for summary judgment, a court reviews the evidence and inferences in the light most favorable to the non-movant.

*Lemelle v. Univ. Mfg. Corp.*, 18 F.3d 1268, 1272 (5th Cir.1994).

*Age and Religious Employment Discrimination Law*

■ Employment discrimination claims under the ADEA and Title VII can be proved by either direct or circumstantial evidence. *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 219 (5th Cir.2001). Direct evidence is evidence, "which if believed, proves the fact of discriminatory animus without inference or presumption." *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 897 (5th Cir.2002)(holding that comments that there was "too much grey hair" in management and that the CEO had decided to "skip a generation" in selecting plaintiff's replacement were not direct evidence of discrimination).

■ In the absence of direct proof of discrimination, both ADEA cases and Title VII cases are governed by the tripartite burden-shifting test established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Crawford v. Formosa Plastics Corp.*, 234 F.3d 899, 901 (5th Cir. 2000); *Wyvill v. United Cos. Life Ins. Co.*, 212 F.3d 296, 301 (5th Cir.2000). Under the test, Mercer must establish a prima facia case of discrimination by showing that (1) she was terminated, (2) she was qualified for her position, (3) she was within the protected class at the time of the termination, and (4) she was replaced by someone outside of the protected class. *See Crawford*, 234 F.3d at 902. If Mercer makes her prima facia showing of discrimination, the burden shifts to Capital Management to "articulate a legitimate, non-discriminatory reason" for terminating Mercer. *See id.* Capital Management's burden is of production only, no credibility assessments are made about the employer's given reasons. *See Tex. Dep't of*

*Cmty. Affairs v. Burdine,* 450 U.S. 248, 255–56, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). If Capital Management makes this showing, the burden shifts back to Mercer to prove by a preponderance of the evidence that Capital Management's proffered reasons are pretextual. *See Crawford,* 234 F.3d at 902.

 The ultimate determination is whether a reasonable fact finder, viewing all evidence in a light most favorable to the plaintiff, could infer discrimination. *See Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. A court should consider "the strength of the plaintiff's prima facia case, the probative value of proof that the employer's explanation is false, and any other evidence that supports the employer's case." *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 146, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). Because direct evidence is rare in discrimination cases a plaintiff ordinarily must rely on circumstantial evidence. *See Scott v. Univ. of Miss.,* 148 F.3d 493, 504 (5th Cir.1998). An inference of discrimination may arise from strong circumstantial evidence supporting the plaintiff's prima facia case, but the plaintiff must come forth with more than a mere scintilla of evidence. *See Reeves,* 530 U.S. at 147, 120 S.Ct. 2097; *Wyvill,* 212 F.3d at 301. Strong circumstantial evidence of pretext may create a genuine issue of material fact without independent evidence that discrimination was the real reason for an adverse employment action. *Walton v. Bisco Indus., Inc.,* 119 F.3d 368, 372 (5th Cir.1997). Weak evidence, however, may permit a tenuous inference of pretext but still be insufficient to support a reasonable inference of discrimination. *Travis v. Bd. of Regents of the Univ. of Tex. Sys.,* 122 F.3d 259, 263 (5th Cir.1997). A court makes the determination "on a case-by-case basis, depending on the nature, extent, and quality of the evidence, as to whether a jury could reasonably infer discrimination." *Crawford,* 234 F.3d at 903.

## ANALYSIS

### Direct Evidence of Discrimination

Mercer offers no direct evidence of either age or religious discrimination. Mercer does not allege that anyone at Capital Management told her she was fired or disliked because of her religion or her age. Both claims are therefore analyzed under the *McDonnell Douglas* test.

### Religious Discrimination

 Mercer's claim for religious discrimination rests solely on Toler's comments that she was "overly religious" and that she should "tone it down" by removing her figurines from the facility office.

Mercer has shown the first element of her prima facia case because she was terminated. Mercer has satisfied the second element by showing that she was qualified for her position; she had over nine years of experience managing the Lone Star facility. Capital Management does not dispute her qualifications. As for the third element, Title VII prohibits employment discrimination based on an individual's religious beliefs, and the Court does not question the sincerity of Mercer's asserted religious beliefs.

However, Mercer has failed to establish the fourth element of her prima facia case: that she was replaced by an individual outside of the protected class. Mercer identifies herself as a Christian. Mercer put forth no evidence suggesting that the Marshalls or the two female Capital Management employees who temporarily worked at the Lone Star facility were not Christians or were any less religious than Mercer. Mercer's conclusory argument that her replacements were not religious because they did not display religious arti-

facts is insufficient to meet her burden. Summary judgment for Capital Management is proper as to Mercer's Title VII claim.

*Age Discrimination*

■ As discussed above, Mercer has satisfied the first and second elements of her prima facia case. The third element is satisfied because Mercer was sixty years old when she was terminated. Mercer argues that the fourth element is satisfied because she was replaced by two women in their thirties. Capital Management asserts that the two women were temporary replacements until Mercer vacated the on-site apartment and the Marshalls were Mercer's permanent replacements. The two women worked at Lone Star for a few weeks at most, and they never moved on-site. The Marshalls moved on-site after Mercer vacated. The Marshalls are within the same protected age class as Mercer; Jesse Marshall is older than Mercer, and Dee Marshall is only slightly younger than Mercer.

Mercer argues that she was replaced by the younger women because they were the only employees hired by Capital Management in January 2005. The two women did replace Mercer immediately, and Capital Management has not shown that the women were never intended to be permanent replacements. For summary judgment purposes, the Court resolves any doubts in Mercer's favor and finds that Mercer has made a prima facia showing of age discrimination.

■ Capital Management satisfied its initial burden of offering non-discriminatory reasons for terminating Mercer: insub-

ordination and work not performed to standards during the ninety-day probationary period.[2] Capital Management admits that chain-of-command issues existed, but argues that Mercer was insubordinate in contacting EBS and complaining about Capital Management. Capital Management asserts that Mercer complained to EBS about changes Capital Management had directed her to make, often resulting in EBS directing Mercer to not make the changes. Mercer does not dispute that she copied EBS on a letter to Capital Management in which she criticized Capital Management. Mercer also sent EBS a fax in which she stated that Capital Management was going to "cost [EBS] severely if something is not done very soon." Capital Management also asserts Mercer's numerous complaints about company policies and her general failure to implement directives as non-discriminatory reasons for her termination.

■ The critical inquiry is the third step of the *McDonnell Douglas* test—whether Mercer met her burden of showing by a preponderance of the evidence that Capital Management's proffered reasons are pretextual. Mercer has not done so.

■ Peterson's affidavit does not show age-based discrimination against Mercer. Peterson's testimony that she saw Capital Management hire young workers does not show that Mercer was discriminated against. Peterson's subjective belief that Capital Management and Toler "felt threatened by older employees" is not competent summary judgment evidence to

---

**2.** The Court takes as true Mercer's denial that she discussed salaries with other Capital Management employees. Capital Management cannot use Mercer's retention of the office computer as a reason for her termination because that occurred after Capital Manage-

ment terminated her. Capital Management also admits that the last reason in the Termination Notice—that Mercer allowed the new software to be installed on the old computer— was not a reason for her termination.

show that Capital Management's reasons for terminating Mercer were pretextual. *See Pfeil v. Intecom Telecomm's,* 90 F.Supp.2d 742, 746 (N.D.Tex.2000) ("Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence."). Furthermore, comments Ankney may have made to Jesse Marshall that "higher ups" wanted younger employees does not show that Capital Management intentionally discriminated against Mercer. Ankney did not identify who the "higher ups" were; Mercer cannot show that Ankney was referring to the same individual(s) at Capital Management who made the decision to terminate her.

Viewing all of the evidence in the light most favorable to Mercer, a fact-finder might infer general age-based animus on Capital Management's part. However, the evidence is not sufficient to either show pretext or support a reasonable inference of discrimination. *See Travis,* 122 F.3d at 263. The chain-of-command issues between EBS and Capital Management were real, and Capital Management acknowledges that Mercer was caught in the middle. However, Mercer was Capital Management's employee. Her complaints about Capital Management's policies, her resistance to following directives, and her direct complaints to EBS about Capital Management are sound business reasons for her termination. Any inference of age discrimination is also weakened by the "same actor inference," which suggests that Capital Management would not have hired sixty-year-old Mercer if Capital Management was discriminatory. *See Nieto v. L & H Packing Co.,* 108 F.3d 621, 624 (5th Cir.1997). Mercer's evidence is not sufficient evidence to rebut Capital Management's nondiscriminatory reasons and does not support an inference that the real reason for her termination was discrimination. *See Crawford,* 234 F.3d at 904 (up-holding summary judgment for employer in age discrimination case where termination for employee's poor performance was not a pretext for discrimination).

## CONCLUSION

For the foregoing reasons, the Court **GRANTS** Capital Management's motion for summary judgment on Mercer's ADEA and Title VII employment discrimination claims and **DENIES as moot** all other pending motions.

**So ORDERED and SIGNED this 2nd day of November, 2006.**