**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**
June 30, 2009

Charles R. Fulbruge III
Clerk

No. 08-10191

Matrix Oncology, L.P.

Plaintiff-Appellee

v.

Priority Healthcare Corp.

Defendant-Appellant

Appeal from the United States District Court
for the Northern District of Texas

Before GARWOOD, GARZA, and OWEN, Circuit Judges.

PER CURIAM:[*]

This appeal results from a jury verdict rendered in favor of plaintiff-appellee, Matrix Oncology, L.P. (Matrix). The jury awarded Matrix $3,000,000 in damages for negligent misrepresentations committed by defendant-appellant, Priority Healthcare Corporation (Priority). The verdict was returned on November 9, 2007, and the district court entered a Final Judgment for Matrix on November 13, 2007. On November 27, 2007, Priority filed a Renewed Motion

---

[*]Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

1

for Judgment as a Matter of Law, which the district court denied on February 4, 2008. Priority now appeals to this Court. For the following reasons, we AFFIRM.

## I. FACTS AND PROCEEDINGS BELOW

On January 30, 2004, Matrix and Priority entered into a joint-venture agreement to form Matrix Oncology, L.L.C. (the LLC), an enterprise to purchase and sell cancer-fighting drugs. Specifically, the LLC would operate as a group purchasing organization to get drug-pricing discounts for members of its oncology clinic. Matrix owned forty percent of the LLC and Priority owned sixty percent. The LLC was successful from the start, generating almost $1.5 million in profits in its first eleven months of operation.

In October 2004, Matrix and Priority began discussions to dissolve or "unwind" the LLC by having Priority purchase Matrix's forty percent interest in the LLC. During these discussions, John Rivers, the senior vice president in charge of cancer drugs for Priority, informed Matrix of merger negotiations between Priority and One Equity Partners (OEP) whereby OEP would acquire Priority's distribution business, which included Priority's interest in the LLC. It was believed that such a combination would add considerable value to Priority and its subsidiaries, including the LLC.

Prompted by these negotiations between Priority and OEP, both Matrix and Priority wanted Matrix to receive an additional payment if, after Matrix's sale of its forty percent LLC interest to Priority, OEP acquired Priority's cancer-drug distribution section and the LLC. Matrix representative William Jordan[1] told Rivers (of Priority) that Matrix wanted this additional payment as

---

[1] Specifically, Jordan is one of six members of Matrix Genpar, L.L.C. and a limited partner in Matrix Holdings, L.P. Matrix Genpar L.L.C. is the general partner of Matrix Holdings, L.P. and Matrix Holdings, L.P is the sole partner of Matrix.

compensation for Matrix's loss of any future sale of the LLC that would have resulted in material gain to Matrix had it not first sold its interest in the LLC to Priority. Rivers recommended that Jordan and Tom Barr, another Matrix representative,[2] meet with Rebecca Shanahan, Priority's executive vice president of strategic ventures and general counsel, regarding dissolution of the LLC.

On January 12, 2005, Steve Cosler, Priority's CEO, received a phone call from Dom Meffe, senior vice president of specialty pharmacy for Express Scripts (ESI) and president and chief executive officer of CuraScript (a subsidiary of ESI). In that call, Meffe (of ESI) informed Cosler (of Priority) that ESI was interested in acquiring Priority's business.[3] The very same day, Cosler reported that phone call to Priority's Chairman of the Board of Directors and single largest shareholder, William Bindley, who then informed three other Priority Board members. Cosler also informed Stephen Saft, Priority's Chief Financial Officer, of ESI's interest on January 12.

On January 20, 2005, Jordan (of Matrix), Barr (of Matrix), Shanahan (of Priority), and Guy Bryant, an executive vice president of Priority, met to discuss the unwinding of the LLC. During this meeting, Jordan asked Shanahan if Priority was discussing a merger or acquisition with any other companies. Shanahan told Jordan that she knew of no other offers at that time, and Matrix does not dispute that Shanahan did not know of other offers at the January 20 meeting. On February 9, 2005, Shanahan (Priority's general counsel) sent an

_____

[2]Barr is also a member of Matrix Genpar, L.L.C. and a limited partner of Matrix Holdings, L.P.

[3]This was not the first contact between these companies regarding a possible merger or acquisition. ESI and Priority had discussed ESI's possibility of acquiring Priority in the fall of 2003. During the 2003 discussions, the two companies began a due-diligence review and ESI proposed a buyout, but the negotiations fell through a few months later when ESI acquired another company.

email to Priority representatives Rivers, Bryant, and Saft explaining that she had advised Wayne Whitman, Matrix's counsel, that there were no current plans or activities to sell Priority.

Draft agreements dissolving the LLC were exchanged between the parties on January 28, 2005 and February 21, 2005. In the drafts, an acquisition of the LLC by OEP was the only listed transaction that would trigger any additional payment to Matrix.

In mid-February, Meffe (of ESI) again contacted Cosler (of Priority) and stated that ESI's Board of Directors continued to be interested in doing a business deal with Priority. On February 23, Cosler presented this information to the Priority Board of Directors, stating that ESI had a "strong interest" in acquiring Priority. Shanahan was present at this meeting and admits that she learned of ESI's interest a few days prior to the board meeting.

On March 4, 2005, Priority and Matrix signed a Membership Transfer Agreement (the MTA). Jordan testified that a few days prior to this signing, he again asked Shanahan if Priority was involved in merger or acquisition discussions with any company other than OEP, and Shanahan answered no. Priority disputes that this inquiry took place only a few days before March 4, as evidenced by Shanahan's February 9 email.

According to the terms of the MTA, Priority paid $600,000 for Matrix's interest in the LLC. The parties also agreed that if there were a third-party sale of the LLC to OEP after Matrix received its $600,000, Matrix would receive an additional payment of $3 million:

> "Priority is currently in negotiations with a third party, [OEP] . . . . In the event that Priority or the [LLC] shall, as a result of any Transaction between the [LLC] or Priority and OEP or its affiliates . . . enter into any joint venture with OEP or its affiliates or sell any ownership interest in the [LLC], . . . the [LLC] and Priority shall .

4

. . pay [Matrix] the aggregate sum of $3,000,000 . . . . As used herein, 'Transaction' shall mean any agreement between and among Priority or the [LLC] (or any of their respective affiliates) and OEP or its affiliates that is a joint venture, sale or exchange of ownership interest in the [LLC] to OEP or its affiliates within the eighteen (18) months after [March 4, 2005]."

Membership Transfer Agreement, § 3.

The MTA also contains broad releases. The MTA contains a release by Matrix of "all Transferor Released Claims," defining "Claims" as "any and all manner of claims . . . whether now known or hereafter discovered." *Id.* § 1. "Transferor Released Claims" includes any "statement, omission, duty, action or failure to act" arising from the joint venture and related agreements or "any other relationship or transaction" between the parties "from the beginning of the world through the Effective Date." *Id.* §1.

Section 6.2 of the MTA provides that "notwithstanding anything to the contrary contained [in the Agreement]" Priority was not in "any manner released, relieved or discharged from any Claims . . . arising out of . . . or relating to any obligations (including monetary obligations) . . . under th[e] Agreement." Section 6.4 states that parties "may hereafter discover material facts in addition to or different from those that they now know or believe to be true" and "that they assume[]the risk of any mistake of fact or law with regard to all aspects of this Agreement and any asserted rights released hereby." Priority proposed an additional carve out exception for negligent misrepresentation claims, but Whitham (Matrix's counsel) and the drafter of section 6.4, did not incorporate the proposal into the final contract.

Twelve days after the MTA was signed, ESI again contacted Priority about the possible acquisition. Priority hired a financial advisor, JP Morgan, to help Priority with the sale, and the negotiations began in earnest. On July 21, ESI

5

announced that it was buying Priority for $1.3 billion. Priority, being a publicly-traded company, filed a Proxy Statement with the Securities and Exchange Commission, according to which, Priority was pursuing a transaction with ESI between January and March 2005:

> "On January 12, 2005, Express Scripts again approached us and expressed an interest in acquiring our business. On that day, in a call between [Cosler and Meffe] . . . , Mr. Meffe stated that Express Scripts was interested in a potential acquisition of Priority. In mid-February 2005, Mr. Meffe informed Mr. Cosler that, following a meeting of the board of directors of Express Scripts, Express Scripts continued to have an interest in the potential acquisition. Mr. Cosler described these discussions to our board of directors at its meeting on February 23, 2005."

The National Association of Securities Dealers ("NASD"), which regulates Priority's publicly-traded stock, requested information regarding the proposed purchase and asked for a list of companies that had expressed an interest in a potential business combination with Priority. Priority did not mention OEP in its response. The sale closed in October 2005 and encompassed Priority and all of its subsidiaries, including the LLC.

Matrix then filed suit against Priority claiming its right to the additional $3 million payment. Matrix raised claims for statutory fraud, common-law fraud, securities fraud, reformation, negligent misrepresentation, and breach of fiduciary duty. The case was tried before a jury on November 5, 2007. At the close of Matrix's case, Priority filed a Motion for Judgment as a Matter of Law; the motion was denied. Priority renewed its motion at the close of all the evidence, but again, the motion was denied. On November 9, 2007, the jury returned its verdict, finding that Priority negligently misrepresented information upon which Matrix justifiably relied to its detriment and awarded Matrix $3 million. Final Judgment was entered on November 13, 2007. Priority

6

thereafter filed a Renewed Motion for Judgment as a Matter of Law, which was likewise denied. Priority now appeals to this court. The parties agree that in this diversity case the applicable substantive law is that of Texas.

## II. DISCUSSION

### A. Standard of Review

This court reviews a district court's denial of a motion for judgment as a matter of law *de novo. Travelers Cas. and Sur. Co. of Am. v. Ernst & Young LLP*, 542 F.3d 475, 481 (5th Cir. 2008). "A jury verdict must be upheld unless there is no legally sufficient evidentiary basis for a reasonable jury to find as the jury did." *Id.* at 481–82 (quoting *Foradori v. Harris*, 523 F.3d 477, 485 (5th Cir. 2008)); *see* FED. R. CIV. P. 50(a)(1). "We draw all reasonable inferences and resolve all credibility determinations in the light most favorable to the nonmoving party." *Id.* at 482. The district court's denial of such a motion will only be reversed "if the evidence points so strongly and so overwhelmingly in favor of the nonmoving party that no reasonable juror could return a contrary verdict." *Id.*

At trial, Matrix presented evidence of two alleged misrepresentations made by Priority: (1) that Priority falsely represented it was in negotiations with OEP, and (2) that Priority falsely represented it was not in negotiations with any other interested third parties. The jury was instructed as follows:

> "Matrix has sued Priority for negligent misrepresentations regarding the existence and extent of Priority's negotiations with third parties concerning the potential sale or acquisition of all or part of Priority and/or the LLC. . . . Did Priority make a negligent misrepresentation on which Matrix justifiable relied?"

The jury answered, "yes;" thus, the verdict could have been based on either (or both) alleged misrepresentations.

Priority argues, however, that it is entitled to judgment as a matter of law

7

on Matrix's negligent misrepresentation claims because (1) Matrix cannot establish justifiable reliance as a matter of law; (2) Priority's representations were immaterial to Matrix's decision to sign the MTA; and (3) there is insufficient evidence to support the jury's damages award.

## B. Justifiable Reliance

Priority first argues that Matrix cannot establish justifiable reliance as a matter of law because section 6.4 of the MTA expressly disclaims reliance.

To support a claim for negligent misrepresentation under Texas law, the plaintiff must show that it justifiably relied on a defendant's representation. *Fed. Land Bank Ass'n of Tyler v. Sloane*, 825 S.W.2d 439, 442 (Tex. 1991). Reliance can, however, be disclaimed. *See Forest Oil Corp. v. McAllen*, 268 S.W.3d 51, 58, 60 (Tex. 2008). To determine if a waiver-of-reliance provision is binding, courts must examine the contract itself and the totality of the surrounding circumstances. *Id.*; *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 179 (Tex. 1997). When making this determination, courts should be guided by the following factors: "[whether] (1) the terms of the contract were negotiated, rather than boilerplate, . . . ; (2) the complaining party was represented by counsel; (3) the parties dealt with each other in an arm's length transaction; (4) the parties were knowledgeable in business matters; and (5) the release language was clear." *Forest Oil*, 268 S.W.3d at 60.[4]

Priority argues that the disclaimer contained in section 6.4 uses clear language that unequivocally expresses an intention to disclaim reliance. Section 6.4 states that parties "may hereafter discover material facts in addition to or different from those that they now know or believe to be true" and "that they

---

[4]In the present case, it is indisputable that the parties are sophisticated businessmen, who were represented by qualified counsel in an arm's length transaction.

assume[]the risk of any mistake of fact or law with regard to all aspects of this Agreement and any asserted rights released hereby."[5]  Section 6.4, however, must be read in conjunction with section 6.2 of the MTA.  Section 6.2 provides that "notwithstanding anything to the contrary contained [in the Agreement]" Priority was not in "any manner released, relieved or discharged from any Claims . . . arising out of . . . or ***relating to*** any obligations (including monetary obligations) . . . under th[e] Agreement." (emphasis added).  Section 6.2 qualifies the section 6.4 disclaimer and carves out Matrix's misrepresentation claim.  *Cf. Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983).

Priority disputes this, arguing that section 6.2 carves out claims related to ***contractual obligations***, and the misrepresentation was unrelated to any obligations contained in the MTA.  However, courts have held that a negligent misrepresentation claim, though not grounded in contract, can *relate to* the contract and its obligations.  *See, e.g., Von Graffenreid v. Craig*, 246 F. Supp. 2d 553, 560 (N.D. Tex. 2003) (holding that, where allegedly false representations were made in the course of negotiations of a Guaranty Agreement, a negligent misrepresentation claim "relate[d] to" the contract); *Polk v. St. Angelo*, No. 03-01-00356-CV, 2002 WL 1070550 (Tex. App.—Austin May 31, 2002, pet. denied).

For example, in *Polk*, a buyer sued a real estate agent for negligent

---

[5]This language is similar to that of other disclaimers which Texas courts have given effect, albeit in unpublished opinions.  *See Garza v. State and County Mut. Fire Ins. Co.*, No. 2-06-202-CV, 2007 WL 1168468 at *6 (Tex. App.—Fort Worth Apr. 19, 2007) (finding that provisions stating that the plaintiff did "not rely and [has] not relied upon any representation . . . by any of the Released Parties" and "assume[s] the risk of any mistake of fact in connection with the true facts involved in said controversy" conclusively negated justifiable reliance); *see also, Seniguar v. Ford Motor Co.*, Nos. 02-41160 and 02-51025, 2003 WL 21417131 at *1 (5th Cir. June 2, 2003) (finding reliance had been disclaimed in a settlement agreement which provided that the plaintiffs: "assumed the risk of any and all claims for damages which . . . they did not know or suspect to exist . . . and which whether or not, if known, would have materially affected the decision to enter into the agreement").

misrepresentation due to a disclosure made in connection with the property she purchased. The jury found for the purchaser and awarded her attorney's fees based on an earnest money contract, which provided: "If Buyer . . . is a prevailing party in any legal proceeding **brought under or with relation to this contract**, such party shall be entitled to recover . . . attorney's fees." *Id*. at *2. On appeal, the agent claimed that attorneys' fees were improperly awarded because the negligent misrepresentation was not based upon the contract. The court disagreed, holding that the contract's implementation was contingent on the disclosure form, thus, the misrepresentation that form contained was "'related to' the contract." *Id*. at *3.

Like the buyer in *Polk*, Matrix was induced to enter the MTA based on Priority's representations that it was involved in discussions with only one third-party, OEP. Matrix representatives testified that the representation was critical to their decision to execute the MTA; thus, the implementation of this contract—just as in *Polk*—was predicated on a representation that "relates to" the MTA and Priority's obligations thereunder.

Priority argues, however, that the *Polk* carve out is far broader than section 6.2; in *Polk*, the carve out includes any legal proceeding "in relation to the contract," whereas, section 6.2 only carves out claims related to **obligations** under the contract. It is true that Priority's representation that it was only in discussions with OEP was not a contractual obligation. However, Priority was obligated by the "Additional Payment" provision in the event that OEP purchased Priority or the LLC, and Priority's false representation of discussions with OEP and no other parties was directly related to the "Additional Payment" obligation's terms. Evidence exists that Priority was in discussions with another third party and, more significantly, that Priority was no longer in negotiations

10

with OEP as of February 23, 2005, rendering the "Additional Payment" provision misleading. Based on this, a reasonable jury could conclude that Priority misrepresented information "related to" its obligations under the MTA.

Priority, however, argues that the misrepresentation claim was not based upon any "obligation" under the agreement, but, instead, arose from the MTA's formation, and that section 6.2, which offers a release limited to contemplated transactions (*i.e.*, obligations), does not apply to claims arising from formation. But section 6.2 is broader than this. It not only reserves claims "arising under" the MTA's obligations, but also those claims "arising out of," "involving," "regarding," or "relating to" the MTA's obligations. And if section 6.2 were intended to be limited to breach of contract claims, it would only have reserved claims "arising under" the MTA's obligations. Section 6.2 reserves Matrix's misrepresentation claim because it relates to those obligations made possible by the false representation.

Section 6.2 carves out Matrix's misrepresentation claims and, thus, qualifies and trumps the section 6.4 disclaimer as it relates to the claim at issue.[6] Therefore, the district court properly denied Priority's Renewed Motion for Judgment as a Matter of Law.

## C. Materiality

Second, Priority argues that the district court erred in denying its motion because Priority's representations regarding its third-party merger negotiations were immaterial to Matrix's decision to sign the MTA. "Only representations of material facts are actionable under . . . negligent misrepresentation theories." *Haralson v. E.F. Hutton Group, Inc.*, 919 F.2d 1014, 1030 (5th Cir. 1990),

---

[6]To the extent, if any, that the agreement remains ambiguous after application of relevant principles of construction and interpretation, the ambiguity is resolved in favor of the verdict.

11

*overruled on other grounds by Gustafson v. Alloyd Co.*, 513 U.S. 561 (1995). This Court has looked to the Restatement of Torts, which defines a matter as material if:

> "'(a) a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question;' or
> '(b) the maker of the representation knows or has reason to know that its recipient regards or is likely to regard the matter as important in determining his choice of action, although a reasonable man would not so regard it.'"

*See U.S. v. Davis*, 226 F.3d 346, 358 (5th Cir. 2000), *cert. denied*, 121 S.Ct. 1161 (2001) (quoting Restatement (Second) of Torts § 538 (1976)). Thus, "a statement could indeed be material, even though only an unreasonable person would rely on it, if the maker knew or had reason to know his victim was likely so to rely." *Id.* at 359.[7]

In the case at hand, the record shows that both parties placed significance on the possibility of other third-party merger negotiations. First, the record shows that Priority considered ESI's overtures important. Cosler (of Priority) first became aware of ESI's renewed interest in a business deal in a three-minute phone call between himself and Meffe (of ESI) on January 12, 2005.[8] That very day, Cosler reported the phone call to William Bindley, the Chairman

---

[7]There is no indication that Texas courts would not apply § 538, and appellant does not contend otherwise. Texas courts have looked generally to the Restatement (Second) of Torts in negligent misrepresentation cases. *See, e.g., Federal Land Bank v. Sloane*, 825 S.W.2d 439, 442-43 (Tex. 1991); *McCamish, Martin v. F.E. Appling*, 991 S.W.2d 787, 790-91 (Tex. 1999). *Cf.* Exxon Corp. v. Emerald Oil & Gas Co. L.C., ___ S.W.3d ___, ___ (Tex. 2009), 2009 WL 795668 *10.

[8]Again, this was not the first contact between these companies regarding a possible merger or acquisition. ESI and Priority had discussed ESI's possibility of acquiring Priority in the fall of 2003. During the 2003 discussions, the two companies began a due-diligence review and ESI proposed a buyout, but the negotiations fell through a few months later after ESI acquired another company.

of Priority's Board and Priority's single largest shareholder. Bindley then informed three other Priority board members, also that very same day. Cosler also informed Saft, Priority's CFO and a signatory to the MTA, of ESI's interest on January 12.

Meffe contacted Cosler on February 21, 2005 to again indicate that ESI's board was interested in acquiring Priority. In a February 23, 2005 board meeting, Cosler informed Priority's directors and top executives that ESI had indicated a "strong interest" in acquiring the company and that ESI's Board had convened to authorize further negotiations. Significantly, Priority's public filings included information about its January and February interchanges with ESI, but made no mention of negotiations with OEP. In fact, the NASD specifically asked for a list of other companies that had shown an interest in a potential business combination with Priority—Priority named only two other interested companies, neither of which were OEP. The response letter also stated that "[d]uring the time that [Priority] engaged in discussions with [ESI] regarding this transaction, [Priority] did not actively seek other buyers and no other companies expressed an interest in acquiring [Priority]." Finally, at the time the MTA was signed, OEP had done no due diligence, though ESI had performed considerable due diligence in 2003, when it was first interested in purchasing Priority.

The evidence also shows that Matrix considered other third-party negotiations to be material and that Priority was aware that Matrix placed importance on this issue. On January 20, 2005, Matrix representatives, Jordan and Barr, asked Priority representatives, Shanahan and Bryant, if Priority was discussing a merger or acquisition with any other companies. Shanahan told Jordan that she knew of no other offers at that time, and Bryant nodded in affirmation of her answer. Matrix does not dispute that neither Shanahan nor

13

Bryant were aware of other offers at this time; however, the inquiry gave Shanahan reason to know Matrix considered the matter important.

On February 9, 2005, Shanahan sent an email to Priority representatives Rivers, Bryant, and Saft explaining that she had advised Whitman (Matrix's counsel) that there were no current plans or activities to sell Priority. It is undisputed that Saft (of Priority), a signatory to the MTA, was aware of ESI's interest as of January 12, but did not correct Shanahan's mistake. It is also undisputed that Shanahan (of Priority) became aware of ESI's interest a few days prior to the February 23 board meeting. And Jordan (of Matrix) testified that only a few days prior to signing the MTA on March 4, 2005, he *again* asked Shanahan if Priority was involved in merger or acquisition discussions with any company other than OEP, and Shanahan answered no.[9] Presumably, Shanahan's February 9 email put Saft (of Priority) on notice that Matrix considered discussions with other interested third parties material, but he did not correct Shanahan's misrepresentations prior to signing the MTA on March 4, 2005.

The above facts demonstrate that the misrepresentation was material. Not only did both parties attach importance to a possible merger with ESI, but Matrix twice inquired about a possible merger with other parties, making Priority aware that Matrix was likely to regard such information as important in determining whether to enter into the transfer agreement. Certainly a jury could conclude from these facts that a reasonable man would attach significance

---

[9] Priority disputes this, arguing that Jordan's inquiry was made in early February, as evidenced by Shanahan's February 9 email. Because credibility determinations are left to the factfinder, this Court must infer that the jury credited Jordan's testimony over the argument based on the email.

to ESI's overtures, that Priority itself attached significance to the calls,[10] and that Priority was aware that Matrix attached significance to the possibility of other third party negotiations. Thus, the district court properly denied Priority's Renewed Motion for Judgement as a Matter of Law on this matter.

**D. Damages**

Third, Priority argues that the court erred in denying its motion because Matrix did not have a submissible case of damages. Specifically, Priority alleges that (1) Matrix's damages were pure speculation, and (2) the jury impermissibly awarded benefit-of-the-bargain damages.

Negligent misrepresentation damages are limited to out-of-pocket expenses; damages for benefit-of-the-bargain are not available. *Fed. Land Bank Ass'n of Tyler v. Sloane*, 825 S.W.2d 439, 443 (Tex. 1991). "The out-of-pocket measure computes the difference between the value paid and the value received, while the benefit-of-the-bargain measure computes the difference between the value as represented and the value received." *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 49 (Tex. 1998). A jury may award damages anywhere within the range of evidence presented at trial. *MCN Energy Enterprises, Inc. v. Omagro de Colombia, L.D.C.*, 98 S.W.3d 766, 772 (Tex. App.—Fort Worth 2003, pet. denied).

Priority argues that the jury awarded benefit-of-the-bargain damages simply because the jury awarded an amount that corresponded exactly to the $3 million Priority would have been obligated to pay had the transaction with OEP been realized. Yet, at trial, Matrix presented evidence that Priority, falsely

---

[10]Priority's CEO testified it was his regular practice to disclose such overtures to the board, but again, credibility determinations are left to the jury, and a reasonable person could conclude that the disclosure, rather than merely routine, was due to the perceived significance of the calls.

representing that it was only in discussions with OEP and promising Matrix $3 million if that deal were to close, induced Matrix to sign the MTA. And relying on those representations, Matrix *parted with something*—its 40% interest in the LLC, the LLC having earned nearly $1.5 million in profits in its first eleven months. At trial, a chartered financial analyst testified that Matrix's 40% interest in the LLC could be valued at anywhere between $2.35 million to $4.501 million. Thus, the $3 million damage award was within the range of presented evidence and constituted the jury's assessment of Matrix's out-of-pocket damages.

Priority also argues that Matrix's only evidence of damages is the self-serving testimony of Barr and Jordan, who both testified that they would not have sold Matrix's LLC interest had they known discussions were being conducted with parties other than OEP. *See Bridgen v. Scott*, 456 F. Supp. 1048, 1063 (S.D.Tex. 1978) ("[S]elf-serving speculative testimony concerning what a party would have done under different circumstances . . . does not provide the basis upon which a verdict can be predicated."). This Circuit requires "substantial evidence to create a jury question." *Travis v. Board of Regents of University of Texas*, 122 F.3d 259, 263 (5th Cir. 1997), *cert. denied*, 522 U.S. 1148 (1998). And Priority cites to several cases overturning damage awards that were overly speculative. *E.g., Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 50 (Tex. 1998) (holding that evidence of damages was legally insufficient and overly speculative where the interested party testified that, had he known the truth, he would have increased his bid from $600,000 to $1.3 million, a bid that likely would have never been accepted by the offending party); *Richter, S.A. v. Bank of Am. Nat'l Trust & Sav. Ass'n*, 939 F.2d 1176, 1188 (5th Cir. 1991) (holding that evidence of damages was insufficient where an interested party testified that he could have sold his

16

interest for $1.6 million where there was no evidence that anyone ever made such an offer and the party had previously admitted that the interest was worthless).

Matrix's case, however, is not analogous to those cited above. Matrix did not speculate as to other transactions it may have entered into; the testimony simply indicates that, had it known the truth, it would not have entered into the terms of *this* transaction. The record shows that Jordan testified at trial that he would not have signed the MTA had he known of discussions with companies other than OEP. Similarly, Barr, who was not a signatory, testified that he would not have recommended that Matrix sign the MTA had he known the disclosures made in the proxy statement regarding ESI's interest. Matrix's inquiries as to other merger and acquisition discussions corroborate their testimony because the inquiries, at the very least, indicate that Matrix considered such discussions consequential to its ultimate decision to enter into the agreement. Last, a financial analyst valued Matrix's forty-percent interest in the LLC to adequately support an amount of damages, and this evidence was presented to the jury.

Evidence exists to support the damages award as being neither overly speculative nor impermissible benefit-of-the-bargain damages; thus, the district court properly dismissed Priority's Renewed Motion for Judgment as a Matter of Law on this issue.

### III. CONCLUSION

Priority has failed to show that it was entitled to judgment as a matter of law on Matrix's negligent misrepresentation claims. Making all reasonable inferences and viewing all the evidence in a light most favorable to the verdict, a jury could reasonably conclude that Matrix justifiably relied on a material misrepresentation. Further, a legally sufficient evidentiary basis exists for the

jury's damages award. For the foregoing reasons, the district court did not err in denying Priority's motion for judgment as a matter of law.

AFFIRMED.